[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 28, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-12527

_____

D.C. Docket No. 96-01679 CV-DMM


FOGADE, FONDO DE GARANTIA DE DEPOSITOS Y
PROTECCION BANCARIA (Fogade) an agency of
the Republic of Venezuela, CORPOFIN, C.A.,
AS LIQUIDATOR

Plaintiffs-Appellees,

versus

ENB REVOCABLE TRUST, a trust organized under
the laws of the British Virgin Islands,
JUAN SANTAELLA, JULIO C. LEANEZ, OSCAR
L. ZAMORA, MERCORP ADVISORS, INC. a British Virgin Islands Corporation,
EASTERN NATIONAL BANK, ADCO ASSOCIATES, INC.,

Defendants-Appellants.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 28, 2001)**
Before CARNES and MARCUS, Circuit Judges, and HAND[*], District Judge.

_____

[*]Honorable William B. Hand, U.S. District Judge for the Southern District of Alabama,
sitting by designation.

CARNES, Circuit Judge:

The plaintiffs in this lawsuit are the Venezuelan agency, Fondo de Garantia de Depositos y Proteccion Bancaria (FOGADE), and Corpofin, C.A., a Venezuelan company that FOGADE placed in intervention. The individual defendants – Juan Santaella, Julio C. Leanez, and Oscar L. Zamora – were former shareholders and controlling board members of Corpofin. The remaining defendants – the ENB Revocable Trust, Mercorp Advisors, Inc., Eastern National Bank, and ADCO Associates, Inc. – are business entities that are directly or indirectly controlled by the individual defendants.

Plaintiffs filed suit in the United States District Court for the Southern District of Florida, alleging that the individual defendants had misappropriated from Corpofin the stock of Eastern National Bank (ENB), a United States chartered bank in Miami.[1] The district court initially dismissed plaintiffs' complaint (the second amended one) on forum non conveniens grounds, concluding that it involved primarily Venezuelan legal issues between Venezuelan parties, arising from transactions most of which had occurred in Venezuela. The plaintiffs subsequently requested leave to amend the complaint (for a third time) so

---

[1]Plaintiffs initially sought a preliminary injunction preventing the individual defendants from selling the ENB stock to Union Planters, a Tennessee-based banking entity. The district court denied the requested preliminary injunctive relief, and we affirmed in an unpublished opinion. See FOGADE v. Union Planters Corp., No. 96-4915 (11th Cir. June 30, 1997).

2

that it would focus on defendants' alleged misappropriation of the ENB shares, which took place primarily in Miami, and would omit claims that focused on defendants' alleged violations of Venezuelan corporate and banking law. After reviewing plaintiffs' revised allegations, the district court granted plaintiffs' motion for leave to file a third amended complaint. The court eventually granted summary judgment in favor of plaintiffs on their claims of conversion and for reclamation of shares, and it ordered that the shares of ENB be returned to Corpofin.

The defendants' appeal brings us issues involving the jurisdiction of the district court over the case when it entered the order granting plaintiffs leave to amend after the court had already dismissed the complaint on forum non conveniens grounds, and the propriety of the court's grant of summary judgment to plaintiffs on their conversion and reclamation of shares claims. The defendants also attempt to appeal the dismissal of certain counterclaims they filed, but we lack jurisdiction to review that dismissal.

## I. BACKGROUND

### A. FACTS

In early 1994, Venezuela suffered a banking crisis engendered by the failure of Venezuela's largest bank. Several Venezuelan banks were forced to seek

financial assistance from FOGADE, a Venezuelan agency, similar to the Federal Deposit Insurance Corporation, that provides financial assistance to struggling Venezuelan depository institutions.  Bancor, S.A.C.A., was one such bank.  The individual defendants were minority shareholders and controlling board members of Bancor.  The majority of Bancor's shares, in turn, was owned by Corpofin, and the individual defendants were also minority shareholders and controlling board members of Corpofin.

Between March and June of 1994, Bancor received financial aid from FOGADE equivalent to $300 million at the then-prevailing exchange rates.  In June of 1994, on the stated grounds that Bancor had not repaid its debts or increased its capital, FOGADE caused the Superintendency of Banks to "intervene" Bancor, a process similar to placing a company in receivership in the United States.  In September of 1994, upon a finding that Corpofin was related to Bancor and that Corpofin had very large unguaranteed debts with Bancor, FOGADE caused the Superintendency of Banks to intervene Corpofin as well. As part of the  intervention process, FOGADE removed the individual defendants from the management of both Bancor and Corpofin and replaced them with FOGADE-appointed boards.  In October 1995, the Republic of Venezuela, through its Financial Emergency Board,  ordered that Bancor be liquidated.  Corpofin

4

remains intervened, though defendants contend that the authority for intervention of it has expired under Venezuelan law.[2]

Corpofin's interventor, Juan Miguel Senior, who is responsible for marshaling the corporation's assets for the benefit of creditors, discovered documents detailing a series of transactions between subsidiaries of Corpofin, as well as shell corporations within the exclusive control of the defendants, that had resulted in the transfer of all shares of Eastern National Bank outside of Corpofin's ownership and control. Those documents were dated May 9, 1994, exactly one day before the individual defendants had been removed from control of Bancor by resolution of FOGADE.[3] In any event, on May 9, 1994, Corpofin owed Bancor approximately $16.5 million.

Prior to the May 9, 1994 transactions (if they did take place on that date), the corporate structure was as follows: Corpofin, the parent company, owned 100% (70,000 shares) of First Bancorporation ("First Bancorp"). First Bancorp in turn owned 95% of the shares of ENB and 100% of the shares of Eastern Overseas

---

[2] Between 1994 and 1996, the shareholders of Bancor and Corpofin brought a number of lawsuits in Venezuela contesting the interventions and liquidation of Bancor. As of the date of oral argument in this case, those suits had not yet been resolved.

[3]There is evidence that the May 9, 1994 transactions did not actually occur on that date but that the documents were instead backdated. Whether they were backdated or not does not enter into our decision, and for convenience sake we will refer to the documents and transactions as having occurred on May 9, 1994.

Bank ("Eastern Overseas"). Eastern Overseas owned the remaining 5% of the ENB shares. Allegedly in order to shield the ENB stock (valued at $30 million) from judicial proceedings in Venezuela, Corpofin, at the direction of the individual defendants, engaged in the following five May 9th transactions:

(1.) Corpofin transferred 64,000 shares of First Bancorp, valued at $28.5 million, to Eastern Overseas for the equivalent of $795,000.

(2.) Those 64,000 shares of First Bancorp were then transferred by Eastern Overseas, for approximately $795,000, to Mercorp Advisors ("Mercorp"), a shell corporation allegedly created for the sole purpose of restructuring the ENB ownership.

(3.) Corpofin then transferred, for approximately $75,000, the remaining 6,000 shares of First Bancorp directly to Mercorp, which now owned 100% of the First Bancorp stock, and Bancorp in turn owned 95% of ENB.

(4.) First Bancorp then transferred its 95% ownership of ENB to Mercorp in exchange for a $28.5 million promissory note that was subsequently cancelled and never paid.

(5.) Finally, Mercorp transferred its 95% ownership interest in ENB to the ENB Revocable Trust ("the ENB Trust"), of which the individual defendants are among the trustees and beneficiaries; and Corpofin caused all of the

6

stock of Eastern Overseas, as well as the remaining 5% of ENB, to be transferred to ADCO associates, another corporation controlled by the individual defendants. The consideration for both of these transfers also consisted of a promissory note that was subsequently canceled.

The final corporate structure was as follows: Corpofin retained no ownership interest in any of the corporations, including ENB. ADCO owned 5% of the ENB stock and 100% of Eastern Overseas. Mercorp owned 100% of First Bancorp and the ENB Revocable Trust owned 95% of the ENB stock. Thus, Corpofin, which owed Bancor $16.5 million, received approximately $870,000 in exchange for its entire ownership interest in ENB, which was valued at $30 million,while various business entities under the control of the individual defendants ended up owning all $30 million worth of those ENB shares.

## B. PROCEDURAL HISTORY

In order to prevent the defendants from selling the ENB stock to Union Planters Corporation, in June of 1996 FOGADE and Corpofin[4] brought this lawsuit in the district court against the individual defendants, the various business entities

---

[4]Plaintiffs sued as the Republic of Venezuela by and through FOGADE, Juan Miguel Senior as interventor of Corpofin and Corpofin, depending on the stage of the case.

under the individual defendants' control, and Union Planters Corporation. The

lawsuit sought a constructive trust over the ENB stock or the proceeds of its sale.

The basis of FOGADE's claim was that the individual defendants had perpetrated a

several-hundred-million-dollar fraud on FOGADE and Bancor arising out of

insider loans, self-dealing, and misuse of financial aid provided by FOGADE to

Bancor. Corpofin, through its government appointed intervenor, claimed that the

individual defendants had misappropriated its ownership interest in ENB.

At the same time they filed their complaint, plaintiffs also filed a motion for

a temporary restraining order and a preliminary injunction. The district court,

observing that, "it appears that the shares of [ENB] were fraudulently conveyed to

[the defendants] . . . ," granted a temporary restraining order preventing the

defendants from removing the ENB shares from the court's jurisdiction. However,

after conducting an evidentiary hearing on plaintiffs' motion for a preliminary

injunction, the district court denied that motion on grounds the  plaintiffs had an

adequate remedy at law for their claims. On appeal, in an unpublished opinion we

affirmed the denial of the preliminary injunction.  See FOGADE v. Union Planters

Corp., No. 96-4915 (11th Cir. June 30, 1997). After that, plaintiffs twice amended

their complaint, with the result being a second amended complaint containing

claims for reclamation of shares under Fla. Stat. § 678.315, rescission, specific

performance, injunctive relief, fraud, breach of fiduciary duties, conversion, and fraudulent transfer.

### 1. The Dismissal on Forum Non Conveniens Grounds

The defendants moved to dismiss plaintiffs' second amended complaint on grounds of forum non conveniens and international comity. On April 21, 1997, the district court granted that motion on forum non conveniens grounds, explaining that otherwise it would have been forced to divine and correctly apply Venezuelan substantive law. The dismissal, however, was conditioned on defendants' consent to the jurisdiction of the Venezuelan courts. Although ordering dismissal, the court did not direct entry of a final judgment pursuant to Fed.R.Civ.P. 58.

Plaintiffs timely filed a Rule 59(e) motion, asking the district court to reconsider or amend the April 21, 1997 order of dismissal, and asserting that the defendants had failed to comply with the conditions of the dismissal. On August 18, 1997, the district court denied the motion for reconsideration, reaffirming its prior ruling that the case should be dismissed on forum non conveniens grounds. However, in its August 18 order denying the motion for reconsideration, the court amended its April 21, 1997 order of dismissal by imposing the following condition upon the dismissal: "the Moving Defendants shall file sworn declarations no later than August 29, 1997, unequivocally indicating that they agree to submit to the

9

jurisdiction of the Venezuelan courts ... failure to comply with this requirement shall result in the denial of the Moving Defendants' Threshold Motion to Dismiss." Again, the court refrained from directing entry of a final judgment pursuant to Fed.R.Civ.P. 58.

On August 28, 1997, defendants filed declarations that did not comply with the court's order, together with a motion seeking leave to file those declarations. Plaintiffs opposed that motion, and they cross-moved for an order enforcing the August 18th order, specifically that part of it which provided that the defendants' failure to file by August 28 sworn declarations unequivocally indicating submission to the jurisdiction of the Venezuelan courts would result in denial of their motion to dismiss. At the same time, plaintiffs also requested leave to file a third amended complaint. They contended that their proposed third amended complaint eliminated the claims based on Venezuelan law (such as claims for breach of fiduciary duties to Bancor and misuse of FOGADE funds), and also that, unlike the preceding version of the complaint, this one focused on two events that took place primarily in Miami: the May 9, 1994 transfers of ENB stock, which was largely done in Miami; and the alleged misappropriation of $2.3 million from

Bancor, which was conducted through a series of wire transfers at ENB, a Miami bank.[5]

On September 23, 1997, the district court denied defendants' motion to file non-complying affidavits and ordered them to file by October 3, 1997 affidavits that fully complied with the conditions of the August 18, 1997 order. In that same September 23 order, the court denied without prejudice the plaintiffs' cross-motion to enforce the August 18 order.

Because the district court's September 23, 1997 order did not address the plaintiffs' request to file a third amended complaint, the plaintiffs on September 24 filed a motion for clarification about that. The defendants say that they filed declarations on September 25 and on September 30 that fully complied with the conditions set out in the August 18 order. Whether that is true or not, the district court did not acknowledge receipt of those declarations, much less find that they fully satisfied the condition set out in the August 18 order. Neither did the court enter a Rule 58 final judgment subsequent to the receipt of the affidavits. Instead, on September 26, 1997, the court granted plaintiffs' motion for clarification, stating that if the plaintiffs wished to proceed under a third amended complaint,

_____

[5]As it turns out, the former allegation is involved in this appeal, but the latter one is not.

11

they must file a separate motion that would be addressed by the judge who would be handling the case thereafter.

After the April 21, 1997 order granting the motion to dismiss had been issued, and while the plaintiffs' motion to reconsider or amend that order of dismissal was pending, the case was reassigned from Judge Moreno to Judge Middlebrooks, but with the proviso that Judge Moreno would decide all previously filed motions, and that Judge Middlebrooks would decide the matters arising thereafter. All the orders we have discussed to this point were entered by Judge Moreno, while all those discussed hereafter were entered by Judge Middlebrooks.

## 2. Granting of Leave to Amend

On October 2, 1997, plaintiffs filed their separate motion for permission to file a third amended complaint. The plaintiffs argued that the third amended complaint, by concentrating on conduct that occurred in Miami, cured the deficiencies that had led the court to dismiss the earlier version of the complaint on forum non conveniens grounds. The court granted the motion for leave to amend the complaint. The third amended complaint contained claims under civil RICO 18 U.S.C. §§ 1962(b), (c) & (d) and 1964 (c) & (d), and for breach of contract, fraudulent inducement, conversion, replevin, fraudulent transfers, civil conspiracy, reclamation of shares, and unjust enrichment.

12

Defendants moved for reconsideration arguing that, in light of the court's April 21, 1997 forum non conveniens dismissal, and its subsequent denials of post-judgment relief, the court lacked jurisdiction to grant plaintiffs leave to amend. The court denied the motion for reconsideration. Defendants then filed a motion to dismiss the third amended complaint, again raising forum non conveniens arguments as well as principles of international comity. That motion, too, was denied.

### 3. Dismissal of the Counterclaims Pursuant to the Act of State Doctrine

Unable to convince the district court to reinstate its previous order of dismissal, the defendants filed their answer and counterclaims to the third amended complaint. Their affirmative defenses asserted that FOGADE lacked standing to sue on behalf of Corpofin because FOGADE's intervention of that corporation was unlawful. Their counterclaims alleged that FOGADE and others had conspired to illegally confiscate in Venezuela and the United States assets of the defendants, including Bancor, Corpofin and ENB. Plaintiffs moved to dismiss the counterclaims on grounds that they were immune from suit under the foreign sovereign immunity doctrine and the act of state doctrine. On September 18, 1998, the district court granted plaintiffs' motion to dismiss as it applied to thirteen of the fifteen counterclaims on grounds of the act of state doctrine. On October 21, 1998,

13

the court converted the motion to dismiss as it applied to the remaining two counterclaims into a motion for summary judgment and granted that motion on grounds other than the act of state doctrine.

### 4. Granting of Partial Summary Judgment on the Claims

Thereafter, plaintiffs and defendants cross-moved for partial summary judgment. Corpofin argued three theories in support of its motion for partial summary judgment: that defendants had converted Corpofin's ownership interest in First Bancorp, Eastern Overseas, and ENB; that defendants had wrongfully transferred the stock of those corporations in violation of Fla. Stat. Ann. § 678.315, which entitles "any person against whom the transfer of a security is wrongful for any reason . . . [to] reclaim possession of the certificated security;" and, that defendants had defrauded creditors, in violation of Florida's fraudulent transfer statute, Fla. Stat. § 726.105.

The district court granted summary judgement in favor of Corpofin on its conversion and reclamation of shares claims.[6] In doing so it concluded that there was no genuine issue of material fact about the defendants' liability to Corpofin for

---

[6]By that time the case was traveling on a fourth amended complaint. As we will note later in our discussion of the merits of the summary judgment, before granting it the court had determined that an amendment was necessary to add two indispensable parties, and the plaintiffs made that amendment. So, the partial summary judgment was actually entered not on the third amended complaint but on the fourth amended one.

14

conversion of the stock of First Bancorp, Eastern Overseas and ENB.[7] That conversion, the court ruled, was "wrongful" as that term is used under the reclamation of shares statute. Accordingly, pursuant to Fla. Stat. § 678.315, the court ordered that the stock of First Bancorp be returned to Corpofin; the stock of Eastern Overseas be returned to First Bancorp; and the stock of ENB be returned to First Bancorp and Eastern Overseas. Thereafter, acting under Fed.R.Civ.P. 54(b), the court expressly directed the entry of partial final judgment for Corpofin providing relief on those two claims and certifying there was no just reason for delay. Defendants filed a notice of appeal from the resulting partial final judgment as to those claims.

## II. DISCUSSION

### A. THE DISTRICT COURT'S JURISDICTION OVER THE CASE WHEN IT GRANTED THE LEAVE TO AMEND

Defendants contend that the district court lacked jurisdiction over the case when it entered the order granting the plaintiffs' motion to file the third amended complaint and therefore did not have jurisdiction to enter any subsequent orders either, including the one granting summary judgment to plaintiffs on two of the

---

[7]The court determined that it need not decide the merits of plaintiffs' fraudulent transfer claims because the relief sought by them was equally available under the conversion or reclamation of shares claims. The court did not rule on any of the plaintiffs' other claims, either.

15

claims contained in the fourth amended complaint. The arguments of the parties speak in terms of the orders of Judge Moreno and those of Judge Middlebrooks, and whether the latter judge had the authority over the case after what the former had done, and so forth. We will disregard the identity of the judge who entered a particular order in this case, because it makes no difference. Judicial power and authority is not personal, and every district judge can exercise all the authority and power of the court on which the judge sits and no more. For purposes of the jurisdictional and authority issues in this case, it matters not that two judges sat in tandem on it, and we will treat them as one. The question is whether the district court lost jurisdiction over the case at any point prior to October 15, 1997, when it granted plaintiffs' motion for leave to file their third amended complaint.[8]

---

[8] To recapitulate what we have discussed in the procedural history section, above, the pertinent orders and motions leading up to the critical October 15, 1997 order, came as follows (with the more relevant dates highlighted):

(1) **April 21, 1997**, the district court grants Defendants' January 24, 1997 motion to dismiss on forum non conveniens grounds; (2) May 5, 1997, plaintiffs timely file a Rule 59(e) motion to reconsider, vacate, alter or amend the April 21, 1997 order; (3) **August 18, 1997**, the court denies plaintiffs' Rule 59(e) motion, but amends its April 21, 1997 order to specify that defendants must file written declarations by August 29, 1997; (4) August 28, 1997, defendants file non-complying affidavits plus an emergency motion for clarification as to the August 18 order requiring written declarations; (5) September 10, 1997, plaintiffs file a response to defendants' motion for clarification as well as a cross-motion for denial of the defendants' January 24, 1997 motion to dismiss and to vacate pursuant to Rule 59(e) or 60(b), and they request leave to file a third amended complaint; (6) **September 23, 1997**, the court denies both parties' motions, and extends time for defendants to file the requisite declarations; (7) September 24, 1997, plaintiffs file a motion for clarification as to the status of their request to

16

Of course, the "[s]ubject matter jurisdiction of the district court is a legal question that we review de novo." Bishop v. Reno, 210 F.3d 1295, 1298 (11ᵗʰ Cir. 2000).

As a general matter, a dismissal based on the doctrine of forum non conveniens usually "puts an end to the action," and is therefore a final appealable order if the other prerequisites for finality are met. Norwood v. Kirkpatrick, 349 U.S. 29, 31 (1955) (quotation omitted); see also Sigalas v. Lido Mar., Inc., 776 F.2d 1512, 1516 (11th Cir. 1985) ("Disposition of a case on forum non conveniens grounds per se is a final order subject to appeal."). The core of the defendants' position is that the district court's April 21, 1997 forum non conveniens dismissal order was final and did end the case in the district court with the result that the court lacked jurisdiction to grant the plaintiffs' motion for leave to file a third amended complaint as it purported to do on October 15, 1997. Defendants contend that, because the forum non conveniens dismissal order constituted a final appealable order, once the time period for filing a notice of appeal from that order expired, that was the end of this lawsuit in federal court.

---

file a third amended complaint; (8) **September 26, 1997**, the court grants the plaintiffs' motion for clarification and instructs them that a separate motion must be filed regarding the third amended complaint, and the court reaffirms its September 23 order; and (9) **October 15, 1997**, the court grants leave to file Third Amended Complaint.

The problem with defendants' position is that it ignores the requirements of Federal Rule of Civil Procedure 58, which provides that: "[e]very judgment shall be set forth on a separate document. A judgment is effective only when so set forth . . . ." Fed. R. Civ. P. 58. The separate judgment rule of Rule 58 is important, having been "designed to eliminate the confusion that previously arose regarding whether a particular order was a final judgment triggering the limitations period for appeal." Kent v. Baker, 815 F.2d 1395, 1397 (11th Cir. 1987); accord Sanders v. Clemco Industries, 862 F.2d 161, 167 (8th Cir. 1988) ("[T]he separate-document rule ... plays an important role in making a judgment 'final' for purposes of determining when the time for filing post-judgment motions or notice of appeal starts to run.") (citation omitted).

It is undisputed that the district court's April 21, 1997 order dismissing the case on forum grounds was never entered as a separate judgment in compliance with Rule 58. As a result, the time for filing of a notice of appeal from that dismissal order never started to run. See Fed. R. App. P. 4(a)(1)(A) ("[T]he notice of appeal ... must be filed ... after the judgment or order appealed from is entered.") (emphasis added); Fed. R. App. P. 4(a)(7) ("A judgment or order is entered for purposes of this Rule 4(a) when it is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil Procedure."); see also Reynolds v. Golden Corral

18

Corp., 213 F.3d 1344, 1346 (11th Cir. 2000) ("[C]ases from both the Supreme Court and the circuit courts of appeal make it clear that the time to file a notice of appeal does not begin to run until a separate judgment is entered pursuant to Rule 58."); Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350, 1356 (11th Cir. 1994) (same); Kent, 815 F.2d at 1397 (noting that we mechanically apply Rule 58 to protect the right of appeal, and that the district court's dismissal order in that case, "constitute[d] an opinion rather than a separate final judgment. It did not trigger the time period for an appeal."); Matter of Kilgus, 811 F.2d 1112, 1117 (7th Cir. 1987) ("A party safely may defer the appeal until Judgment Day if that is how long it takes to enter the [Rule 58] document."); Jetero Constr. Co., Inc. v. South Memphis Lumber Co., Inc., 531 F.2d 1348, 1351 (6th Cir. 1976) ("[A] District Court's disposition of an action is not final for purposes of appeal and for purposes of various post-judgment motions until judgment has been entered.").[9]

---

[9]Under our circuit law there is one circumstance in which a Rule 58 separate judgment is not required to start the running of the time for appeal. See Schuurman v. Motor Vessel "Betty K V", 798 F.2d 442, 445 (11th Cir. 1986) (holding that where the district court dismisses a complaint and provides a stated period within which the plaintiff may amend, "the order of dismissal ... becomes final upon the expiration of the time allowed for amendment. The time for appeal is measured from the date on which the district court order of dismissal becomes final."); see also Hertz, 16 F.3d at 1132 (noting the exception); Otis v. City of Chicago, 29 F.3d 1159, 1165 (7th Cir. 1994) (same); Whitaker, 963 F.2d at 835 n.20 (same). That circumstance is not present here.

19

As a result of the time for appeal never having started to run, the district court never lost jurisdiction over the case. See generally, Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58, 103 S.Ct. 400, 402 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control of those aspects of the case involved in the appeal."); Weaver v. Fla. Power & Light Co., 172 F.3d 771, 773 (11th Cir. 1999) (same). [10] It follows that the district court had

---

[10]As defendants point out, under certain circumstances, the party suffering the dismissal may elect to appeal from it even where a separate document judgment has not yet been entered pursuant to Rule 58. See, e.g., Bankers Trust Co. v. Mallis, 435 U.S. 381, 387-88, 98 S. Ct. 1117, 1121 (1978); Reynolds, 213 F.3d at 1345-46. The defendants in the present case argue that plaintiffs "waived" the Rule 58 requirement by treating the April 21, 1997 dismissal order as if it constituted a final judgment – first, by filing a number of post-judgment motions and later, by seeking an extension of time in which to file their notice of appeal. That argument, however, misperceives the doctrine of waiver as it relates to the separate judgment rule and does not adequately deal with the fact that plaintiffs ultimately elected not to treat the order as appealable.

In Bankers Trust, the issue was whether an order could ever be a "final decision" for purposes of 28 U.S.C. § 1291 even though not set forth on a separate document. 435 U.S. at 383, 98 S. Ct. at 1119. In holding that such an order, assuming that it is in fact "final," could be appealable in some circumstances, the Supreme Court recognized that Rule 58 was designed to protect the right to appeal by clearly demarcating when the time period for filing a notice of appeal begins to run. 435 U.S. at 384, 98 S. Ct. at 1120. If, however, a party chooses to appeal an otherwise final order, and the other party does not object to the lack of a separate judgment, nothing would be accomplished by dismissing the appeal and sending the parties back to the district court for entry of a separate judgment in compliance with Rule 58. That is the waiver exception to the separate judgment rule which was recognized in Bankers Trust. 435 U.S. at 387-88, 98 S. Ct. at 1121. The doctrine of waiver is not applicable in this case, however, because the plaintiffs did not choose to appeal the April 27, 1997 dismissal order; they never actually filed a notice of appeal from it. After initially taking actions to keep open the possibility of an appeal, the plaintiffs decided to treat the order as non-appealable, seeking and obtaining permission to file a third amended complaint to cure the problems that had led the court to dismiss the prior version of the complaint.

20

jurisdiction on October 15, 1997 when it granted the plaintiffs' motion for leave to file the third amended complaint, and also on June 15, 1999 when it entered the partial summary judgment in favor of Corpofin (on the fourth amended complaint). We turn now to the merits issues raised in connection with that partial summary judgment over which we have jurisdiction because the district court made the proper certification and entered a separate judgment as to them under Rule 54(b).

## B. THE MERITS OF THE PARTIAL SUMMARY JUDGMENT

We review a grant of summary judgment <u>de</u> <u>novo</u>, using the same legal standard as the district court. <u>See</u> <u>Diaz v. United States</u>, 165 F.3d 1337, 1339 (11th Cir. 1999). Summary judgment is appropriate if the record shows no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. <u>Id.</u>

## 1. <u>The Disposition Below</u>

On January 15, 1999, plaintiffs moved for partial summary judgment on their claims for conversion, reclamation of shares, and fraudulent transfer. The theory behind those claims is that the individual defendants, in their capacity as controlling board members and directors, had caused Corpofin to wrongfully transfer its ownership interest in ENB for inadequate consideration.

*(a) The Conversion Claim*

21

Defendants responded that Corpofin did not have standing to pursue its conversion claim because, at the time of the May 9, 1994 transfers, it did not have an immediate right to possession of the ENB stock. At the time of the transfers, Corpofin owned 100% of First Bancorp, which in turn owned 95% of the shares of ENB. First Bancorp also owned 100% of Eastern Overseas, which in turn owned the remaining 5% of ENB. Defendants argued that because Corpofin was never the direct record owner of the ENB shares, it did not have standing to contest the transfer of those shares from First Bancorp and Eastern Overseas.

The district court rejected defendants' standing argument, finding that because Corpofin owned 100% of First Bancorp, and First Bancorp owned nearly 100% of ENB, Corpofin had standing to maintain its action for conversion as the "equitable owner" of ENB. As to the merits of the conversion claim the court observed that it was undisputed the individual defendants had caused the various corporations under their control to transfer property rights for inadequate consideration. The court also determined that the defendants' admission that they engaged in the suspect transactions in order to protect "their" assets (including the shares of ENB) from appropriation (or as they put it, "misappropriation") by the Venezuelan government established that they possessed the requisite intent to deprive Corpofin of its property interest in ENB. Specifically, the court held that

22

"[a]s long as Defendants took for themselves property that they knew was in the possession of [Corpofin], it does not matter that Defendants believed that they were justified in their acts." Accordingly, the court ruled that defendants were liable to Corpofin for the conversion of First Bancorp, Eastern Overseas and ENB. However, the court also concluded that the equitable relief sought by plaintiffs – the return of the First Bancorp, Eastern Overseas, and ENB shares – was not available under a conversion theory.

### (b) The Reclamation of Shares Claim

The district court next turned to the claim plaintiffs brought pursuant to Florida's reclamation of shares statute. See Fla. Stat. § 678.315.[11] That statute provides, in relevant part:

> (1) Any person against whom the transfer of a security is wrongful for any reason ..., as against anyone except a bona fide purchaser, may:
>
>> (a) Reclaim possession of the certificated security wrongfully transferred . . . .

Id. Although the statute does not define "any person," the district court reasoned by analogy to § 8-315 of the Uniform Commercial Code that "only an owner of

---

[11]As the district court observed, Fla. Stat. § 678.315 had been repealed, but the Florida legislature expressly limited the repeal of the statute, so that it would not "affect an action or proceeding commenced before this act takes effect." Fla. Laws 1998 c. 98-11, § 25. Defendants do not contend that the repeal affects the application of the statute to the transactions involved in this case.

23

securities may maintain an action under § 678.315." But the court also reasoned that, although Corpofin was not the record owner of the ENB shares, it could maintain an action under § 678.315 as ENB's "beneficial" owner. The court concluded that the May 9, 1994 transfers were "wrongful" within the meaning of § 678.315 because, as the court had previously determined, those transfers constituted conversion of Corpofin's property.[12]

## (c) The Relief

In attempting to fashion a remedy for the plaintiffs' reclamation of shares claim, the district court ran into a conceptual problem. The court recognized that: "[Because] some of the transfers were made through corporations that were only recently brought into this lawsuit, First Bancorporation and Eastern Overseas Bank, it is not apparent at first how the equitable relief can be administered." The court reasoned that it could not simply order the defendants to "return" the ENB shares to Corpofin, because Corpofin never directly owned those shares.

In a previous order, the court had determined that First Bancorp and Eastern Overseas were indispensable parties to the lawsuit because they were the record owners of the ENB shares prior to the May 9 transactions. In that earlier order, the

---

[12]The district court did not reach Corpofin's claim for fraudulent transfer because the relief Corpofin sought pursuant to that claim was equally available under the conversion and reclamation of shares claims.

court concluded that due to the indirect ownership structure, "Corpofin's claims are not direct, but derivative in nature." Specifically, the court stated:

> While Corpofin was the equitable owner of the shares of ENB stock at the time of the transfers, it was not the actual owner of the shares. The actual owners of the shares were Eastern Overseas Bank and First Bancorporation, two corporations of which Corpofin was a shareholder. It is settled in this jurisdiction that a corporation is an indispensable party in a derivative action brought by one of its shareholders. (footnote omitted)

For that reason, the district court ordered plaintiffs to file a fourth amended complaint reflecting the addition of First Bancorp and Eastern Overseas as defendants. They did so.

Thereafter, the parties disagreed about whether First Bancorp and Eastern Overseas should be aligned as plaintiffs or defendants. Plaintiffs argued that, although First Bancorp and Eastern Overseas had been added as "nominal" defendants, they should be realigned as plaintiffs in order to reflect their "true interests." Plaintiffs were, they said, seeking "to protect the interests of First Bancorporation and Eastern Overseas Bank by recreating the stock structure in place prior to the wrongful transfers." The defendants responded that they, as the management of First Bancorporation and Eastern Overseas, represented the true interests of those corporations, interests antagonistic to plaintiffs' claims.

25

In its summary judgment order, the district court resolved that issue in favor of plaintiffs, concluding that "the equities of this situation require the relief sought by Plaintiffs." Accordingly, the court constructed the following three step remedy. Under the first step, Corpofin would reclaim its wrongfully transferred shares of First Bancorp. After those shares were returned to Corpofin, the court reasoned, Corpofin would once again be the 100% owner of First Bancorp, making it appropriate to realign First Bancorp as a plaintiff even though its management, consisting of the individual defendants, was hostile to the suit. Under the second step of the remedy, First Bancorp, as a realigned plaintiff, would reclaim its wrongfully transferred shares of Eastern Overseas Bank. Once those shares were returned, the court reasoned, First Bancorp would be returned to its status as the sole shareholder of Eastern Overseas and it would be appropriate to realign Eastern Overseas as a plaintiff. Finally, under the third step, First Bancorp and Eastern Overseas would be able to reclaim their wrongfully transferred shares of ENB, which together total 100% of that corporation's outstanding shares. By implementing this remedy, Corpofin's ownership structure was returned to its original status as it existed prior to the May 9, 1994 transfers.[13]

---

[13]In its final judgment order, the district court specified in more detail which entity was to return what shares where: 1) Mercorp Advisors would return the First Bancorp shares to Corpofin; 2) ADCO Associates would return the Eastern Overseas shares to First Bancorp; 3) the ENB Revocable Trust would return its shares of ENB to First Bancorp; and 4) ADCO Associates

## 2. The Beneficial Ownership Issues

### (a) Defendants' Arguments

Defendants' arguments against the district court's resolution of the conversion and reclamation of shares claims are essentially the same as to both claims. They do not challenge the basic legal proposition that underlies the district court's analysis: that a parent corporation may under certain circumstances pursue, directly as a beneficial or equitable owner, claims to recover property to which the parent's subsidiary alone holds record title. Instead, the defendants challenge the district court's application of that proposition of law to the facts of this case, contending that it was the individual defendants, and not Corpofin, who were the true beneficial or equitable owners of the ENB shares.[14]

---

would return its shares of ENB to Eastern Overseas.

[14]The defendants do not argue the district court erred in holding that a sole shareholder (here Corpofin) can proceed directly as the beneficial or equitable owner in a suit seeking to recapture property to which the corporation alone held title, so we express no opinion on that issue. See Adler v. Duval County School Bd., 112 F.3d 1475, 1481 n.12 (11th Cir. 1997) ("[I]t is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts that did not relate."). The question of whether and under what circumstances it is appropriate to disregard the corporate entity and allow the "real" owner of the corporation's property to proceed in their own right was neither argued in defendants' briefs, nor asserted by them at oral argument. See, e.g., Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (citation and marks omitted).

27

Defendants contest the district court's conclusion that, "there is no doubt that Corpofin, as the 100% owner of First Bancorporation, which in turn owned 95% of the shares of ENB, and wholly owned Eastern Overseas, which owned the remaining 5%, is the beneficial owner of the shares of ENB." They concede that Corpofin owned the corporations that owned ENB, but argue the district court "completely overlooked that Corpofin is actually owned by the individual defendants." In other words, the defendants say that the district court's beneficial ownership analysis simply did not track far enough up the corporate ownership hierarchy. They also point out that it is undisputed that the individual defendants contributed the funds to acquire the shares of ENB. Thus, defendants argue, they, and not Corpofin, were the true beneficial owners of ENB, both before and after the May 9 transfers, and as a result Corpofin did not have standing to bring its reclamation of shares claim.

From this conclusion, defendants argue, it also follows that Corpofin did not have standing to bring its conversion claim. The district court's analysis on this point was essentially the same as on the reclamation of shares claim, concluding that Corpofin had standing as the "equitable owner" of the ENB shares, because: "[I]t is undisputed that First Bancoporation, at the time of the allegedly wrongful acts, either directly or indirectly owned nearly 100% of the outstanding shares of

28

ENB stock, and it is further undisputed that Corpofin in turn wholly owned First Bancoporation." Being consistent, the defendants argue again that the district court's analysis was flawed because it "failed to take into account who owns Corpofin and whose funds were used to purchase ENB."

*(b) Our Analysis*

Defendants' beneficial and equitable ownership arguments are premised on their assertion that they "owned" Corpofin at the time of the May 9, 1994 transactions, but that assertion is not supported by the record. Instead, the record reveals that the individual defendants owned only 44.87% of Corpofin. Thus, they could not have been the beneficial or equitable owners of Corpofin because collectively they held only a minority interest in Corpofin. Defendants do not contest the premise that they could not be the beneficial or equitable owners of Corpofin if they owned only a minority interest in it.

Instead, the defendants accept that premise but attack the district court's reasoning in another way. They contend that "while the individual defendants own 44.87% of Corpofin, the beneficiaries of ENB Trust, another defendant/appellant, owns [sic] the remaining 55.13% of Corpofin . . . . Thus, together, the defendants (the individual defendants and all other beneficiaries of ENB Trust) own both the minority <u>and</u> majority shares of Corpofin." (emphasis in original). The problem

29

with that argument is that the record establishes the beneficiaries of the ENB Trust, in their individual capacities, and not the trust as an entity, own the remaining shares of ENB. The ENB Trust is a named defendant in this action, the individual beneficiaries of that trust are not. The defendants have proffered no legal support for the suggestion, necessarily implicit in their argument, that we should disregard the separate legal status of the ENB Trust so that we can "aggregate" the ownership interest of the individual beneficiaries of that trust with the ownership interest of the individual defendants. Because the defendants collectively held only a minority stake in ENB, their beneficial and equitable ownership arguments fail.[15]

### 3. The Wrongful Transfer Issues

The defendants contend that the district court erred in concluding that the May 9, 1994 transfers were "wrongful" under Florida's reclamation of shares statute, because the court based that conclusion on its earlier erroneous determination that the defendants were liable for conversion. Thus their challenge to the district court's application of the "wrongful" component of the reclamation statute is actually an attack on the merits of the district court's conversion analysis.

---

[15]Because we reject the defendants' contention that they, and not Corpofin, are the true beneficial owners of the ENB shares, we need not address Corpofin's argument that its right to recover the stock of Eastern Overseas and ENB did not require a finding of beneficial ownership because its claims were derivative claims brought on behalf of First Bancorporation and Eastern Overseas.

Under Florida law, a conversion is "an unauthorized act which deprives another of his property permanently or for an indefinite time." Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd., 450 So.2d 1157, 1160-61 (Fla.Dist.Ct.App. 1984) (footnote omitted) (citing Star Fruit Co. v. Eagle Lake Growers, Inc., 33 So.2d 858, 860 (Fla. 1948)); see also National Union Fire Ins. Co. of Penn. v. Carib Aviation, Inc., 759 F.2d 873, 878 (11th Cir. 1985) (applying Florida law). The defendants are liable for conversion if they "deprived" Corpofin of its property by means of an "unauthorized act." The defendants deprived Corpofin and its subsidiaries of property interests by causing Corpofin to transfer away its direct ownership interest in First Bancorp, and by causing First Bancorp to transfer its direct ownership interest in ENB and Eastern Overseas. As the district court observed: "Defendants do not dispute that the Individual defendants were control persons, nor do they dispute that they caused the various corporations under their control to transfer property rights for inadequate or overvalued consideration."

On the question of whether such transfers constituted "unauthorized acts," it is a well-established rule of corporate law that a corporation cannot authorize illegal conduct. See Flight Equip. & Eng'g Corp. v. Shelton, 103 So.2d 615, 621 (Fla. 1958) ("It cannot be disputed that a board of directors of a corporation is without power to ratify that which it cannot do directly or that which it could not

31

authorize be done initially.  It has no power to ratify a void or illegal act."); accord

Wolf v. Frank, 477 F.2d 467, 477 (5th Cir. 1973); 2A William M. Fletcher,

Encyclopedia of the Law of Private Corporations, § 752 (2000) (noting that, like

other cases of agency, a corporation cannot ratify "acts done in violation of law or

in contravention of public policy"). And, as the district court observed,  "the

Defendants have conceded that the allegedly wrongful transfers were conducted in

violation of the Federal Bank Holding Company Act, 12 U.S.C. § 1842, et seq.,

which requires approval from the Federal Reserve prior to the transfer of the

ownership interest in a United States bank to another corporation."  The defendants

do not contest on appeal that the May 9, 1994 transfers they orchestrated violated

the law, specifically the Federal Bank Holding Company Act.

The district court was correct in concluding that the defendants were liable

for conversion because the stock transfers were unauthorized acts that deprived

Corpofin and its subsidiaries of their property. Accordingly, because the sole basis

of the defendants' challenge to the court's finding of wrongfulness under the

reclamation statute is that no conversion occurred, that challenge must fail.[16]

---

[16]Relying on Garner v. Pearson, 545 F.Supp. 549 (M.D. Fla. 1982), the district court also determined that "[a] control person who causes a corporation to transfer property rights for overvalued consideration is liable for conversion." Because we have decided that the defendants were liable for conversion on other grounds, we need not reach defendants' objections to the district court's reliance on Garner.

32

## 4. The Act of State Issues

Defendants asserted a large number of affirmative defenses to the fourth amended complaint, the version of the complaint upon which the district court granted summary judgment for the plaintiffs. On appeal, defendants have pursued only one of the theories they asserted in their affirmative defenses. In essence, defendants contend that FOGADE illegally confiscated all of their financial interests in Venezuela, including their interest in Corpofin, and then, by causing Corpofin to pursue defendants' ownership interests in Eastern National Bank, sought to extend that unlawful confiscation into U.S. territory.[17] Specifically, defendants argue FOGADE is guilty of confiscation and mismanagement of Corpofin and Bancor and assert RICO, conspiracy, fraud, reclamation of shares, unjust enrichment, accounting, waste, and breach of fiduciary theories. Plaintiffs respond before us, as they did in the district court, that the act of state doctrine

---

[17]Actually, the defendants have made this contention in the course of urging us to reverse the district court's dismissal of their counterclaims, some of which were based upon the same illegal intervention theory that is contained in their affirmative defenses. As we will explain later on in this opinion, we lack jurisdiction to review the dismissal of the counterclaim. See Part II. C., infra. Because we do have jurisdiction by virtue of Rule 54(b) to review the summary judgment for plaintiffs on two of the claims, and because the legality of the intervention was raised as an affirmative defense to those claims, we will address it in that context. In other words, we will give the defendants a break and treat the argument in their briefs about the legality of the intervention as though it were asserted against the summary judgment on the claims, as it was in the district court, instead of being asserted solely in support of the counterclaims as it is in the briefs to us.

33

bars consideration of the lawfulness of the Venezuelan government's intervention through FOGADE of Corpofin.

The act of state doctrine limits "the courts in this country from inquiring into the validity of a recognized foreign sovereign's public acts committed within its own territory." Honduras Aircraft Registry, Ltd. v. Honduras, 129 F.3d 543, 550 (11th Cir. 1997). The doctrine requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., 493 U.S. 400, 409, 110 S. Ct. 701, 707 (1990).

The district court agreed with plaintiffs that under the act of state doctrine the intervention of Corpofin must be deemed valid and cannot be subject to review in a United States court.[18] Relying on Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428, 84 S. Ct. 923, 940 (1964), the district court concluded that:

> [w]hether FOGADE and others violated Venezuelan law in committing the alleged acts is irrelevant; "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government ... even if the complaint alleges that the taking violates customary international law."

---

[18]The district court applied the act of state doctrine to reject the defendants' illegal intervention contention in the course of dismissing their counterclaims and did not repeat the analysis in rejecting their affirmative defenses to the plaintiffs' claims. The district court's implicit rejection of those parallel affirmative defenses which raised the same issues must have been on the same basis. In any event, our review is de novo.

Defendants' primary challenge to that reasoning and conclusion is based upon the legislative overruling of Sabbatino by passage of the so-called "Second Hickenlooper Amendment," 22 U.S.C. § 2370(e)(2). The Second Hickenlooper Amendment provides, in relevant part:

> Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits . . . in a case in which a claim of title or other right to property is asserted ... based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of [] state in violation of the principles of international law . . . .

22 U.S.C. § 2370(e)(2). Thus, defendants argue that the district court should not have applied the act of state doctrine to dismiss their counterclaims because plaintiffs' intervention of Corpofin constituted a confiscation of property in violation of the principles of international law.

The Second Hickenlooper Amendment did overrule, at least with respect to confiscations of property, the Sabbatino decision to the extent that it held that the act of state doctrine would apply without regard to whether a foreign state's actions violated international law. Compare Sabbatino, 376 U.S. at 428, 84 S. Ct. at 940 ("[T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government . . . even if . . . the taking violates customary international law."), with 22 U.S.C. § 2370(e)(2) ("[N]o court in the United States shall decline . . . to make a determination on the merits . . . in a

35

case [involving confiscations of property] . . . by an act of [] state in violation of the principles of international law . . . ."); see also Occidental of UMM al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden, 577 F.2d 1196, 1203 n.10 (5th Cir. 1978) ("The Hickenlooper Amendment [] prevents any United States court from applying the federal act of state doctrine if the confiscation violated international law."). However, the Second Hickenlooper Amendment did not overrule the entire Sabbatino decision, nor the act of state doctrine generally. Industrial Inv. Dev. Corp. v. Mitsui & Co., Ltd., 594 F.2d 48, 52 n.7 (5th Cir. 1979) ("[Sabbatino] is still the leading authority on the act of state doctrine."). The question is how the act of state doctrine and Sabbatino, as modified by the Second Hickenlooper Amendment, apply here.

The Second Hickenlooper Amendment has three requirements that must be met before it applies. The Amendment requires: (1) a claim of title or other right to property; (2) based upon or traced through a confiscation or other taking; (3) in violation of international law. 22 U.S.C. § 2370(e)(2). Here, the parties do not dispute that the first requirement is met, because the Venezuelan-controlled Corpofin has asserted a claim of right to the shares of ENB. Regarding the second requirement, defendants argue that Corpofin's alleged ownership interest in ENB is "based upon" Venezuela's intervention of Corpofin, which, defendants contend,

36

was an "illegal confiscation or other taking." As for the third requirement, defendants argue that Venezuela's confiscation of Corpofin without payment of compensation to the individual defendants constituted a violation of international law.

Even assuming that FOGADE's intervention of Corpofin constituted a "confiscation or other taking" (the second requirement), we are not persuaded that it was carried out in violation of international law (the third requirement). As a rule, when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law. See, e.g., Bank Tejarat v. Varsho-Saz, 723 F. Supp. 516, 520 (C.D. Cal. 1989) (declining to apply the Second Hickenlooper Amendment because "the taking by a government of the property of one of its citizens, located within its territory, does not constitute a violation of international law"); F. Palicio y Compania, S.A. v. Brush, 256 F. Supp. 481, 487 (S.D.N.Y. 1966) (declining to apply the Second Hickenlooper Amendment because "confiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law"); cf. De Sanchez v. Banco Central De Nicaragua, 770 F.2d 1385, 1396 (5th Cir. 1985) (noting that section 1605(a)(3) of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, parallels the Second

37

Hickenlooper Amendment, and observing that "[i]njuries to individuals have been cognizable [under international law] only where they implicate two or more different nations . . . [a]s long as a nation injures only its own nationals, however, then no other state's interest is involved; the injury is a purely domestic affair . . .").

None of the decisions that the defendants rely upon are to the contrary. They involve misappropriations by foreign governments of property that belonged to citizens of other countries. See, e.g., Banco Nacional de Cuba v. Farr, 383 F.2d 166, 185 (2d Cir. 1967) (involving the expropriation by the Cuban government of a corporation that "was largely owned by 'nationals of the United States of North America'"); Banco Nacional de Cuba v. Chase Manhattan Bank, 658 F.2d 875 (2d Cir. 1981) (involving the expropriation by the Cuban government of American-owned banks). Because Venezuela's act of intervening Corpofin, a Venezuelan corporation owned entirely by Venezuelan nationals, does not violate international law, the Second Hickenlooper Amendment does not preclude application of the act of state doctrine.

Seeking to avoid this result, defendants attempt to shift the focus away from the plaintiffs' act of intervening Corpofin to their alleged "extraterritorial confiscation" of ENB, which, defendants stress, was at all times located in the

38

United States. In other words, defendants want to collapse the plaintiffs' intervention of Corpofin and their subsequent "confiscation" of the ENB shares into one long drawn out act, arguing that the intervention of Corpofin was "for the sole purpose of confiscating the ENB shares."

Confiscations by a foreign state of property located in the United States, even if the property belongs to one of the foreign state's own nationals, implicates principles of international law. Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51 (2d Cir. 1965). Moreover, a foreign state's expropriations occur in the jurisdiction in which they are perfected. See Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., 392 F.2d 706 (5th Cir. 1968); Maltina Corp. v. Cawy Bottling Co., 462 F.2d 1021 (5th Cir. 1972). Defendants' position is that the plaintiffs' actions about which they complain were not perfected in Venezuela with the intervention of Corpofin, but in this country when the ENB shares were "confiscated" by means of this lawsuit. That confiscation, the defendants argue, constituted a violation of international law, thereby precluding application of the act of state doctrine.

We disagree. As previously noted, the Second Hickenlooper Amendment provides that a federal court must not decline on act of state grounds to address the merits in a case when a party asserts a claim of right "based upon . . . a confiscation

39

or other taking . . . by an act of state in violation of the principles of international law. . . ." 22 U.S.C. § 2370(e)(2) (emphasis added). Thus, the claim to property must be "based upon" – that is, must be derivative of – an act of state that is in violation of international law.

Here the plaintiffs' claim of right to the ENB shares is "based upon" FOGADE's intervention of Corpofin and the defendants' contention that the plaintiffs obtained the ENB shares illegally is also "based upon" FOGADE's intervention of Corpofin. If the plaintiffs legitimately controlled FOGADE, the defendants would have no argument that plaintiffs acted illegally in taking control of ENB. The premise of defendants' position that FOGADE would not have standing to sue on behalf of Corpofin is that FOGADE unlawfully intervened it. So, everything turns on FOGADE's intervention of Corpofin. Thus, the defendants must show that the alleged confiscation of Corpofin was in violation of international law, not that the plaintiffs' subsequent and successful attempt to recapture the ENB shares through Corpofin was. As we have already explained, however, the intervention of Corpofin was purely domestic (to Venezuela) in nature, and does not violate international law. Therefore, because FOGADE's intervention of Corpofin, upon which Corpofin's claim to ENB is based, was not in violation of international law, the Second Hickenlooper Amendment does not

apply to preclude the application of the act of state doctrine to defendants'

affirmative defenses questioning the standing of plaintiffs to sue because of the

alleged illegality of the intervention of Corpofin.[19]

Defendants' final argument about the act of state doctrine is that it should

not be applied where, as here, it is raised only as a response or bar to affirmative

defenses. That argument is inconsistent with the decision of the Supreme Court in

Sabbatino, 376 U.S. at 438-39, 84 S. Ct. at 945-46, upholding application of the

act of state doctrine as the basis for dismissing the defendants' counterclaims

against a foreign state, Cuba. The counterclaims challenged the legitimacy of

Cuba's claim of right to the disputed property. Id. at 439, 84 S. Ct. at 946 ("Since

the act of state doctrine proscribes a challenge to the validity of the Cuban

expropriation decree in this case, any counterclaim based on asserted invalidity

must fail."); see also Empresa Cubana Exportadora de Azucar v. Lamborn & Co.,

652 F.2d 231, 239 (2d. Cir. 1981) ("Depriving a sovereign plaintiff of its act of

---

[19]In their reply brief, for the first time, defendants appear to argue that even if the Second Hickenlooper Amendment does not apply, the act of state doctrine itself is inapplicable in the circumstances of this case, because that doctrine only applies to acts of foreign governments that are a fait accompli within their own territory. We do not pass on that argument, however, because it was not raised in the defendants' opening brief. See Randolph v. Green Tree Fin. Corp., 244 F.3d 814, 816 (11th Cir. 2001) ("'We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.'") (quoting Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir. 1995)); United States v. Oakley, 744 F.2d 1553, 1556 (11th Cir. 1984) (arguments made for the first time in a reply brief are not properly before the Court).

41

state defense to counterclaims would be just as arbitrary and unfair as stripping it of its right to invoke any other affirmative defense, such as the statute of limitations or res judicata."). If the act of state doctrine applies to counterclaims, and we know from Sabbatino that it does, there is no reason it does not also apply to affirmative defenses.

## C. THE COUNTERCLAIMS

The defendants ask us to reverse the district court's September 18, 1998 order dismissing 13 of their 15 counterclaims, but we lack jurisdiction to consider that order. See United States v. Taylor, 632 F.2d 530, 531 (5th Cir. 1980) (order dismissing counterclaim is interlocutory and appeal cannot be taken until judgment makes dismissal final). We do have jurisdiction over the order granting summary judgment to the plaintiffs on two of their claims, because a proper Rule 54(b) certification and partial final judgment was entered as to that order on July 23, 1998, but none has ever been entered as to the dismissal of the counterclaims. Nor has the district court disposed of the case as a whole. So, there is no final judgment as to the case as a whole. See Beluga Holding, Ltd., v. Commerce Capital Corp., 212 F.3d 1199, 1200 (11th Cir. 2000) ("To be a final judgment, the judgment must have disposed of all claims as to all parties.") (footnote omitted).

42

The action the district court took on July 23, 1999 related only to the summary judgment it had entered on two of the plaintiffs' claims. True, the document is captioned "Final Judgment," but that does not mean that it is a final judgment as to all of the claims and counterclaims in the case. To the extent, if any, that the caption implies judgment over the case as a whole, content counts over caption, and the content of the document establishes that it is a Rule 54(b) partial final judgment. The first sentence of the document states: "The Court, upon making the express determination that there is no just reason for delay, hereby directs entry of partial final judgment pursuant to Rule 54(b)." It did so only as to two of the plaintiffs' claims.

The district court has never directed entry of final judgment as to all the claims and counterclaims in the case, nor has it ever decided all of the claims. The partial final judgment the district court entered on July 23, 1999, does state that, while the court retains jurisdiction to decide certain issues relating to costs and damages under temporary restraining order bonds, "[a]ll other motions are DENIED as moot." But claims are not motions, and most of the plaintiffs' claims against the defendants are still outstanding. Indeed, the fact that the district court felt compelled to proceed under Rule 54(b) evidences that there was no final judgment as to all the claims in the case.

Because no final judgment has been entered disposing of all the claims in this case, our appellate jurisdiction is confined to the issues made appealable under Rule 54(b). Those are the issues arising from the summary judgment entered on plaintiffs' reclamation of shares and conversion claims, which we have decided.[20]

### III. CONCLUSION

We AFFIRM the district court's orders granting leave to amend and its order granting partial summary judgment for plaintiffs. We lack jurisdiction to decide any issues arising from the district court's orders relating to the counterclaims.

---

[20]The counterclaims and the affirmative defenses we addressed in Part II. B.4, supra, overlap to a substantial degree, because both raise act of state doctrine issues. What we have held about the act of state doctrine as it involves the affirmative defenses may, as a practical matter (depending upon whether there are any other counterclaim issues), decide how any future appeal of the dismissal of the counterclaims should be decided. But until there is a final judgment entered on the order dismissing the counterclaims, there can be no appeal of that order.