[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-11699
_____

D. C. Docket No. 08-01016-CV-AR

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 9, 2010
JOHN LEY
CLERK

KYLE EDWARDS,
DIANE GEORGE,
RYAN CADE,
KAMERON BATTLES,
KELLY KEY,
individually, collectively and on behalf of
a class of similarly-situated employees,
TERRENCE FORMAN,
JIMMY D. LINCOLN,

Plaintiffs-Appellants,

versus

PRIME INC.,
d.b.a. Ruth's Chris Steak House,
MARKHAM OSWALD,
JESUS MOLINA,
an individual which may or may
not be his real name,
RUTH'S HOSPITALITY GROUP INC.,

Defendants-Appellees,

RUTH'S CHRIS STEAK HOUSE, INC.,
themselves and on behalf of a class of
defendants that operate restaurants named
"Ruth's Chris Steak House,"

Defendant.

———————————————

Appeal from the United States District Court
for the Northern District of Alabama
———————————————

(April 9, 2010)

Before CARNES, HULL and ANDERSON, Circuit Judges.

CARNES, Circuit Judge:

Ruth's Hospitality Group, the parent company of Ruth's Chris Steak House, is proud of its origins. The company boasts that forty-five years after its founder, Ruth Fertel, mortgaged her home to purchase her first restaurant, it has grown into a chain of more than 120 steakhouse restaurants in seven countries. Though it has become an international operation, the company insists that "our success continues to be driven by our adherence to Ruth's core values."[1] Ruth Fertel "understood the value of each and every employee's contribution to her success," and that is why the business continues to be a place "where respect, integrity and pride are a way of life."[2] Not only that but the company "continues to value the unique differences of each and every team member."[3] Or so it says.

———

[1] Ruth's Hospitality Group, Corporate Overview, http://phx.corporate-ir.net/phoenix. zhtml?c=190038&p=irol-homeProfile (last visited Apr. 1, 2010).

[2] Ruth's Hospitality Group, Employment, http://www.ruthschris.com/Careers (last visited Apr. 1, 2010).

[3] Id.

2

The seven former employees of one Ruth's Chris Steak House franchise who are the plaintiffs in this lawsuit not only beg to differ but also have pleaded to the contrary, at least insofar as the franchise where they worked is concerned. According to their allegations, that particular franchise had the core values of a criminal enterprise and provided anything but an atmosphere of respect, integrity, and pride for its employees. More specifically, they allege that the Ruth's Chris Steak House in Birmingham, Alabama, knowingly provided illegal aliens with names and social security numbers of American citizens to use for illegal employment, unlawfully took employees' tips, discriminated on the basis of race, and retaliated against employees who challenged those and other practices.

Those allegations are contained in an amended complaint that asserts claims based on the Racketeer Influenced and Corrupt Organizations Act, the Fair Labor Standards Act, 42 U.S.C. § 1981, and Alabama common law. The district court dismissed four of the fifteen counts in the amended complaint under Federal Rule of Civil Procedure 12(b)(6) and certified those rulings as partial final judgments under Rule 54(b). The plaintiffs have appealed those four rulings, and they have attempted to appeal a number of others that were not certified for interlocutory appeal. Our decision, like the complaint and the district court's judgment, is a mixed bag. We end up reversing the district court's judgment with respect to the

3

RICO claim, affirming the judgment insofar as it includes the other claims that were certified to us under Rule 54(b), and dismissing for lack of jurisdiction the attempted appeal of the rulings that were not certified to us.

**I.**

This case, as we indicated, involves allegations brought by former employees of Ruth's Chris Steak House in Birmingham, Alabama, against the restaurant and its owner, operator, and franchisor. More particularly the defendants are Prime, Inc., a Ruth's Chris franchisee that owns and operates the restaurant where the plaintiffs worked; Mark Oswald, who owns and manages Prime; and Ruth's Chris Steak House, Inc.,[4] which franchises Ruth's Chris restaurants.

At this stage we must and do assume that any well-pleaded allegations in the amended complaint are true. What we state as facts in this part of the opinion have not been established as facts in anything other than the pleading sense. They may or may not turn out to be actual facts. Count 1 claims that the defendants engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.[5] The federal crime that is

---

[4] Ruth's Chris Steak House, Inc. changed its name to Ruth's Hospitality Group before this lawsuit was filed.

[5] For Count 1, the plaintiffs seek Rule 23 certification as class representatives suing on behalf of similarly-situated past and present hourly-wage employees who were employed at

4

said to trigger RICO liability is a criminal enterprise to violate federal immigration laws. Prime knowingly hired and employed illegal aliens, allowed them to work under the names of former Ruth's Chris employees who were United States citizens, and provided them with the former employees' social security numbers. In addition, the defendants gave the illegal aliens more time than federal law permits to produce paperwork establishing their eligibility to work in this country and sometimes did not require the illegal aliens ever to produce the paperwork. To fill open positions, Prime's management asked the illegal aliens employed in the restaurant whether they knew of any other illegal aliens who were interested in working there. Prime paid illegal aliens in cash and preferred them over United States citizens. As part of the illegal enterprise the company also provided illegal aliens with name tags showing names other than their own.

Counts 2–6 claim that the defendants violated the Fair Labor Standards Act, 29 U.S.C. §§ 201–219, primarily by unlawfully taking and keeping plaintiffs' tips for their own profit.[6] Because Prime paid the plaintiffs as "tipped employees," it claimed a "tip credit" and paid them an hourly wage below the minimum wage that otherwise would have applied. As a standard practice Prime withheld a percentage

Prime's franchise restaurants operated as Ruth's Chris Steak House.

[6] Counts 2–6 were brought on behalf of all the plaintiffs, except for Diane George, and on behalf of other "similarly-situated employees."

5

of servers' tips, and a portion of that money was paid to "the house." The rest was placed into a "tip pool," which Prime used to pay other employees, including some who were not eligible to participate in the tip pool. When a manager or supervisor believed that a customer had tipped an employee too much, the manager or supervisor persuaded the customer to reduce the amount of the tip to the employee or not to tip at all. Those practices, it is claimed, rendered defendants' use of the tip credit unlawful under the FLSA, requiring them to pay direct wages for the full minimum wage and to return the tips.

Prime also required the plaintiffs to perform excessive non-serving tasks and duties. Managers and supervisors occasionally "clocked out" the plaintiffs, even though they were still working. In some instances, managers and supervisors docked plaintiffs' hours. Prime also did not keep accurate records of the amount of time employees worked. For the violations claimed in Counts 2–6, the plaintiffs request injunctive and declaratory relief, all unlawfully taken tips, lost minimum and overtime wages, liquidated damages matching the amount of lost tips and wages, and reasonable attorney's fees.

The next two claims in the amended complaint assert violations of Alabama state law.[7] Count 7 claims that Prime and Oswald intentionally interfered with two

---

[7] Counts 7 and 8 are brought by all the individual plaintiffs, except for Diane George.

6

business relationships. One of those relationships was between Prime's employees and the patrons who dine at the restaurant. Prime and Oswald knew about the business relationship in which "employees give patrons excellent service with the expectation they will be rewarded for such service by getting tips and greater tips from patrons, and patrons so reward and pay servers, some of which gets dispersed to other employees via a 'tip pool.'" The other relationship was among Prime's employees who contribute to or receive money from the tip pool. Prime and Oswald intentionally interfered with those business and contractual relations "by taking amounts of money" from the plaintiffs "based on such gratuities paid to servers <u>regardless</u> of whether Defendants otherwise complied with the FLSA in compensating employees." Count 8 alleges that the same conduct constituted conversion under state law. Count 7 and Count 8 both seek relief in the form of compensatory and punitive damages.

The final seven counts of the amended complaint involve individual claims of unlawful discrimination or retaliation. Only a few of them are relevant to this appeal.[8] One of the claims that is relevant is Count 12, in which Kyle Edwards, a

---

[8] The following claims are not at issue in this appeal: In Count 9 Diane George, an African American, alleges that Prime violated § 1981 by subjecting her to a hostile work environment on the basis of her race. In Count 10 Kameron Battles, an African American, alleges that Prime violated § 1981 by denying him job positions and shifts on the basis of his race. Battles alleges in Count 11 that Prime and Oswald violated § 1981 and the FLSA by retaliating against him for filing this action. In Count 15 Kelly Key alleges that Prime violated Alabama Code § 25-5-11.1 by retaliating against her for filing a workers' compensation claim

7

Caucasian, alleges that Prime subjected him to a hostile work environment on the basis of his race, in violation of § 1981. While working at Ruth's Chris, Edwards was targeted by Hispanic and Latino employees who repeatedly threatened him at the restaurant. One employee cursed Edwards and threatened to cut his throat. He complained to Prime's management about the hostile work environment, but they failed to take any action "because Prime disfavored Caucasian Edwards in favor of its Hispanic and Latino employees and did not want to upset them out of fear of disrupting its supply of cheap illegal labor." In addition to being threatened, Edwards was also shunned. One Hispanic employee threatened Edwards, telling him that it was "going to be bad" for the person who was complaining about Prime's employment of illegal aliens.

Count 13 involves Edwards' claim of retaliation by the defendants, a claim that he brought on behalf of himself and other similarly-situated employees. In February 2008, Edwards' attorney gave the general manager of the Birmingham restaurant a copy of the complaint he intended to file in this lawsuit. After that, Edwards was subjected to added scrutiny at work, and the defendants took "no effective action to prevent . . . Edwards' hostile work environment including another employee's additional threat to Edwards after [he] had complained about a

with Prime.

8

threat." Management also reduced his hours and did not allow him to participate in Prime's retirement plan. In order to decrease Edwards' pay and cover up the fact that it was withholding for "the house" a portion of servers' tips, Prime started referring to the withheld percentage as a service charge on the tip reports filled out by banquet servers. Edwards claims that amounted to retaliation that violates the FLSA and § 1981, and he seeks several different forms of relief, including punitive damages.

Finally, Count 14 is Kelly Key's claim of retaliation against Prime. Shortly after this lawsuit was filed, Prime terminated Key's health care benefits and then fired her. She contends that action violated the FLSA and § 1981, and she seeks several different forms of relief, including punitive damages.

## II.

In February 2009, the defendants moved to dismiss part of the amended complaint, which the district court took up at a motion docket. The plaintiffs contend that at the motion docket the district court judge informed all parties present that he was no longer accepting cases, like this one, with Rule 23 allegations. Plaintiffs assert that when cases with Rule 23 allegations were called at the motion docket, the district court judge gave counsel for the plaintiffs in those cases the option of either withdrawing their clients' Rule 23 allegations or having

9

the case reassigned to another judge. Plaintiffs assert that they were not given that choice even though their case includes Rule 23 allegations. Three days after the motion docket, plaintiffs filed a motion for reassignment, which was denied on February 23, 2009.

In response to the defendants' motion to dismiss, the district court issued an order and accompanying memorandum opinion in March 2009. See Edwards v. Prime, Inc., No. 08-1016 (N.D. Ala. Mar. 4, 2009).[9] The court dismissed with prejudice Counts 1, 7, 8, and 12 of the amended complaint. It determined that Count 1, the RICO claim, failed to sufficiently allege that the defendants had engaged in a pattern of racketeering activity. The court concluded that the state law tort claims in Counts 7 and 8 were preempted by the FLSA. It also decided that Edwards' § 1981 hostile work environment claim, which is Count 12, failed to allege that he was discriminated against because of his race.

The district court also dismissed with prejudice Counts 2–6, but only to the extent that they request declaratory and injunctive relief. The court concluded that the remedial provisions of the FLSA do not provide for equitable relief. The district court also dismissed with prejudice Counts 13–14, but only to the extent

---

[9] The district court's March 4, 2009 memorandum opinion incorporates by reference several parts of the court's earlier opinion, which had addressed the original complaint. See Edwards v. Prime, Inc., No. 08-1016 (N.D. Ala. Dec. 11, 2008).

10

that Edwards and Key requested punitive damages, which the court found to be unavailable under 29 U.S.C. § 215.

In its March 4, 2009 order accompanying the memorandum opinion, the district court stated:

> Pursuant to Rule 54(b), F.R.Civ.P., the court expressly determines that there is no just reason for delay in the entry of final judgment against plaintiffs as to the claims contained in Counts I, VII, VIII, and XII. Accordingly, the Clerk is DIRECTED to enter final judgment against plaintiffs as to all said claims.

Those four counts are the only ones against which final judgment was entered.

In their notice of appeal the plaintiffs stated that they sought reversal of the district court's March 4, 2009 order, as well as "all the District Court's decisions subsumed by that order, including without limitation, those in the District Court's Memorandum Opinion also entered on March 4, 2009 that accompanied said Order, and the District Court's Order entered on February 23, 2009 denying Plaintiff's Motion for Re-assignment of this action."  In their briefs to this Court the plaintiffs assert six contentions.  They contend that the district court:  (1) should not have dismissed Count 1, because it properly alleges a RICO claim arising from the defendants' hiring and employment of illegal aliens; (2) should not have dismissed Counts 7 and 8, because those state law tort claims are not preempted by the FLSA; (3) should not have dismissed Edwards' claim of racial

11

discrimination under § 1981, because Count 12 did allege that Edwards was discriminated against "on the basis of his race"; (4) should not have rejected their claims for declaratory and injunctive relief under Counts 2–6, their primary FLSA claims, because that type of relief is available for those claims; (5) should not have ruled that they may not seek punitive damages under Counts 13 and 14, which allege violations of the FLSA's anti-retaliation provision; and (6) should not have denied their motion to reassign the case to another judge, because that denial violated their procedural due process right to be treated the same as the plaintiffs in other cases containing class action allegations.

## III.

Neither party challenges our jurisdiction to consider this appeal, but "we are obligated to address jurisdictional questions" that occur to us. Frulla v. CRA Holdings, Inc., 543 F.3d 1247, 1250 (11th Cir. 2008). Some have.

An appeal from a final judgment of the district court, one disposing of all the claims and defenses of all the parties in a lawsuit, poses no jurisdictional problem. See 28 U.S.C. § 1291. "Ordinarily, however, an order adjudicating fewer than all the claims in a suit, or adjudicating the rights and liabilities of fewer than all the parties, is not a final judgment from which an appeal may be taken." Lloyd Noland Found., Inc. v. Tenet Health Care Corp., 483 F.3d 773, 777 (11th Cir.

12

2007) (citing Lex Tex Ltd. v. Unifi, Inc. (In re Yarn Processing Patent Validity Litig.), 680 F.2d 1338, 1339 (11th Cir. 1982)).

Here, the district court entered a final judgment on Counts 1, 7, 8, and 12 and certified those claims under Rule 54(b) for immediate appellate review.[10] The parties' appetite for appellate review, however, exceeds that of the district court. They are eager for us to consider the entire case. They want an appeal that will consume the entire case, including the district court's partial dismissal of Counts 2–6, 13, and 14, and its denial of the plaintiffs' motion to reassign the case to a different judge. The district court, however, did not certify those decisions under Rule 54(b), and no final judgment has disposed of all the claims in this case.

## A.

Appellate jurisdiction over an appeal from an interlocutory decision certified under Rule 54(b) is limited to the rulings or orders certified by the district court.

---

[10] Federal Rule of Civil Procedure 54(b) provides:

When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the [district] court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

13

See Fogade v. ENB Revocable Trust, 263 F.3d 1274, 1296–97 (11th Cir. 2001) ("Because no final judgment has been entered disposing of all the claims in this case, our appellate jurisdiction is confined to the issues made appealable under Rule 54(b)."); see also United Indus., Inc. v. Eimco Process Equip. Co., 61 F.3d 445, 448 (5th Cir. 1995) ("We lack appellate jurisdiction over the two rulings not referenced by court's certification. In an interlocutory appeal certified by the district court under . . . Rule 54(b), we have no jurisdiction to consider orders of the district court outside the scope of certification."); cf. S.H. v. Edwards, 886 F.2d 292, 293 (11th Cir. 1989) (en banc) ("This case is before the court on a very limited certificate issued by the district court under Rule 54(b) . . . . This ruling is not to be interpreted as involving anything other than the one issue presented.").

If it were otherwise, certification of one claim would effectively certify all decided claims, and that would undermine the "the historic federal policy against piecemeal appeals," a policy that Rule 54(b) preserves, Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 438, 76 S.Ct. 895, 901 (1956). See Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162, 166 (11th Cir. 1997) (repeating our instruction that district courts should "exercise the limited discretion afforded by Rule 54(b) conservatively"); Morrison-Knudsen Co. v. Archer, 655 F.2d 962, 965 (9th Cir. 1981) (Kennedy, J.) (Rule 54(b) certifications "must be reserved for the

14

unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties."). We have no jurisdiction to consider interlocutory orders outside the scope of certification, unless some other basis of jurisdiction exists. See Fogade, 263 F.3d at 1296–97; United Indus., 61 F.3d at 448.

The plaintiffs insist, however, that the district court's Rule 54(b) certification "subsume[s]" all of the decisions they are now challenging before this Court. The text of the certification order does not support that assertion. The district court expressly certified its dismissal of only four claims—those contained in Counts 1, 7, 8, and 12. Where the court, in the next sentence of its order, directed the clerk "to enter final judgment against plaintiffs as to all said claims," it plainly was referring only to the four claims it had just "said" were appropriate for final judgment.

The district court did not certify its decision to dismiss Counts 2–6, which only extended to the declaratory and injunctive relief sought in those claims; nor did it certify its decision to dismiss Counts 13 and 14, which only extended to the punitive damages sought in those claims. The fact that the district court's partial dismissal of those claims came in the same order in which it certified its dismissal

15

of the claims contained in Counts 1, 7, 8, and 12 does not alter our analysis. Rule 54(b) does not give us jurisdiction to review entire orders but only those portions of orders that are properly made into a final judgment and certified under the rule.

Although the district court did not state why it declined to certify its decisions with regard to the claims contained in Counts 2–6, 13, and 14, the court's reason is obvious. None of those partial dismissals is a final judgment disposing of an entire claim.[11] The district court could not have properly certified them because they are not the stuff of Rule 54(b) certification. See Brandt v. Bassett (In re Southeast Banking Corp.), 69 F.3d 1539, 1547 (11th Cir. 1995) ("A judgment properly may be certified under the terms of Rule 54(b) only if it possesses the requisite degree of finality. That is, the judgment must completely dispose of at least one substantive claim." (citation omitted)); see also Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 744 n.4, 96 S.Ct. 1202, 1206 n.4 (1976) ("[A] complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief.").

---

[11] The district court's partial dismissal of Counts 2–6 foreclosed injunctive and declaratory relief, but it left intact the rest of the claim, including the plaintiffs' request for all unlawfully taken tips, lost minimum and overtime wages, liquidated damages matching the amount of lost tips and wages, and reasonable attorney's fees. Likewise, the court's partial dismissal of Counts 13 and 14 foreclosed punitive damages under the FLSA, but it left intact the plaintiffs' request for compensatory damages, back pay and benefits, liquidated damages matching the amount of lost back pay and benefits, reinstatement or front pay, and reasonable attorney's fees.

**B.**

There are statutory exceptions to the final judgment rule. One, contained in 28 U.S.C. § 1292(a)(1), bestows appellate jurisdiction over interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions." Although the parties did not suggest it, we may have jurisdiction under § 1292(a) to review the district court's partial dismissal of Counts 2–6, which was phrased in terms of a dismissal "to the extent that these five counts request injunctive and declaratory relief." But only if that dismissal amounted to the refusal to issue an injunction.

Section 1292(a) is not, however, a golden ticket litigants can use to take any decision affecting injunctive relief on a trip to the court of appeals. Just because a district court's order has the "practical effect of refusing an injunction," it does not automatically qualify for immediate appeal under § 1292(a)(1). Carson v. Am. Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996–97 (1981). The Supreme Court has instructed us that unless such an order threatens a "'serious, perhaps irreparable, consequence'" and can be "'effectually challenged' only by immediate appeal, the general congressional policy against piecemeal review will preclude interlocutory appeal." Id. at 84, 101 S.Ct. at 997 (quoting Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 252 (1955)); see also Citizens Concerned About Our Children v. Sch. Bd. of Broward County, Fla., 193 F.3d

17

1285, 1289 (11th Cir. 1999) ("[A]n order that does not rule on a request for injunctive relief, but that has the effect of denying it, may be immediately appealable. For such an interlocutory order to be appealable before final judgment, the prospective appellant must show that the denial of injunctive relief has a 'serious, perhaps irreparable, consequence, and that the order can be effectually challenged only by immediate appeal.'" (citations omitted)).

An interlocutory order that <u>explicitly</u> denies an injunction, however, "fits squarely within the plain language of § 1292(a)(1)," regardless of whether an immediate appeal is necessary to avert a "serious, perhaps irreparable, consequence." <u>Cable Holdings of Battlefield, Inc. v. Cooke</u>, 764 F.2d 1466, 1471 (11th Cir. 1985) (quoting <u>Carson</u>, 450 U.S. at 84, 101 S.Ct. at 996–97); <u>see also</u> <u>Hutchinson v. Pfeil</u>, 105 F.3d 566, 569 (10th Cir. 1997); <u>Holmes v. Fisher</u>, 854 F.2d 229, 232 (7th Cir. 1988); <u>I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.</u>, 789 F.2d 21, 24 n.3 (D.C. Cir. 1986).

The plaintiffs in this case have never argued that irreparable harm may result from the district court's decision to dismiss the claims in Counts 2–6 insofar as they request injunctive relief, or that immediate appeal of that decision is necessary to avert such harm. Nor have the plaintiffs moved the district court for a preliminary injunction, which indicates that irreparable harm is not likely. <u>See</u>

18

Citizens Concerned About Our Children, 193 F.3d at 1289–90 ("[A] failure to seek immediate relief militates against a conclusion that delaying appeal to final judgment inflicts irreparable harm."). We therefore lack jurisdiction under § 1292(a)(1) to consider the injunctive relief issue, unless the district court explicitly denied an injunction. See Carson, 450 U.S. at 84, 101 S.Ct. at 997; Cable Holdings, 764 F.2d at 1471. And the court did not. Under these circumstances we have no jurisdiction to review before final judgment the district court's partial dismissal of Counts 2–6.

## C.

The district court also did not certify its February 23, 2009 order denying the plaintiffs' motion to reassign the case to another judge, undoubtedly because Rule 54(b)'s plain language limits its application to judgments disposing of claims or parties. The plaintiffs' contention is not that this ruling was or even could have been certified under Rule 54(b), but instead that we should exercise pendent appellate jurisdiction over it. "Pendent appellate jurisdiction is present when a nonappealable decision is 'inextricably intertwined' with the appealable decision or when 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" King v. Cessna Aircraft Co., 562 F.3d 1374, 1379 (11th Cir. 2009) (quoting Swint v. Chambers County Comm'n, 514 U.S. 35, 51, 115 S.Ct. 1203,

19

1212 (1995)).  We see no difficulty in resolving the certified issues without deciding whether the district court properly denied the plaintiffs' motion for reassignment.  See, e.g., King, 562 F.3d at 1380; Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1335 (11th Cir. 1999) ("[W]e may resolve the Eleventh Amendment immunity issue here without reaching the merits of standing[, so t]hese issues are neither 'inextricably intertwined' nor 'necessary to ensure meaningful review' of one another."); Harris v. Bd. of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997) (declining pendent appellate jurisdiction because the qualified immunity issue could be resolved "without reaching the merits of the remaining questions" raised by the parties).  Because the February 23, 2009 order denying the motion to reassign is interlocutory and no exception to the final judgment rule applies to it, we lack jurisdiction to review that order.

**IV.**

"We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6)."  Redland Co., Inc. v. Bank of Am. Corp., 568 F.3d 1232, 1234 (11th Cir. 2009).  We take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs.  Rivell v. Private Health Care Sys., Inc., 520 F.3d 1308, 1309 (11th Cir. 2008).  We are not, however, required to accept the labels and legal conclusions in the complaint as true.

Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1261 (11th Cir. 2009); see also

Ashcroft v. Iqbal, 556 U.S. __, 129 S.Ct. 1937, 1949 (2009) ("[T]he tenet that a

court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions."); Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555, 127 S.Ct. 1955, 1965 (2007) (stating that a complaint "requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do").

Dismissal for failure to state a claim is proper if the factual allegations are

not "enough to raise a right to relief above the speculative level." Rivell, 520 F.3d

at 1309 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. at 1965). "A complaint may

be dismissed if the facts as pled do not state a claim for relief that is plausible on its

face." Sinaltrainal, 578 F.3d at 1260 (citing Iqbal, 129 S.Ct. at 1950; Twombly,

550 U.S. at 561–62, 570, 127 S.Ct. at 1968–69, 1974). "Stated differently, the

factual allegations in the complaint must 'possess enough heft' to set forth 'a

plausible entitlement to relief.'" Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500

F.3d 1276, 1282 (11th Cir. 2007) (quoting Twombly, 550 U.S. at 557, 127 S.Ct. at

1966–67).

**V.**

We begin by applying those standards to Count 1, the RICO claim. Under

21

18 U.S.C. § 1962(c), it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "[T]o establish a federal civil RICO violation under § 1962(c), the plaintiffs must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Williams v. Mohawk Indus. Inc., 465 F.3d 1277, 1282 (11th Cir. 2006) (internal quotation marks omitted); see also Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285 (1985).[12]

"An act of racketeering is commonly referred to as a 'predicate act.'" Mohawk, 465 F.3d at 1283 (quoting Maiz v. Virani, 253 F.3d 641, 671 (11th Cir. 2001)). "A 'pattern' of racketeering activity"—a combination of elements 3 and 4—"is shown when a racketeer commits at least two distinct but related predicate acts." Id. "'If distinct statutory violations are found, the predicate acts will be considered to be distinct irrespective of the circumstances under which they

_____

[12] Although not at issue in this appeal, civil RICO plaintiffs must also satisfy the requirements of 18 U.S.C. § 1964(c). That provision provides "that '[a]ny person injured in his business or property by reason of' RICO's substantive provisions has the right to 'recover threefold the damages he sustains . . . .'" Mohawk, 465 F.3d at 1282 (quoting 18 U.S.C. § 1964(c)) (alterations added by Mohawk). "Thus, under § 1964(c), civil RICO claimants, such as the plaintiffs here, must show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." Id. at 1282–83.

22

arose.'" Id. (quoting Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1397 (11th Cir. 1994), modified on other grounds by 30 F.3d 1347 (11th Cir. 1994)).

Under the RICO Act the term "racketeering activity" includes, among other things, any violation of section 274 of the Immigration and Nationality Act, provided that the act was committed for financial gain. 18 U.S.C. § 1961(1)(F); see Mohawk, 465 F.3d at 1283. In this case the plaintiffs allege that the defendants engaged in "racketeering activity" by violating several provisions of INA § 274, which is codified at 8 U.S.C. § 1324, and that they did so for financial gain. Specifically, the plaintiffs allege that the defendants violated: (1) 8 U.S.C. § 1324(a)(3)(A), which makes it a federal crime for any person to "knowingly hire[ ] for employment at least 10 individuals with actual knowledge that the individuals are [illegal] aliens" during a 12-month period; (2) 8 U.S.C. § 1324(a)(1)(A)(iv), which makes it a federal crime for any person to "encourage[ ] or induce[ ] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law"; (3) 8 U.S.C. § 1324(a)(1)(A)(iii), which makes it a federal crime for any person to knowingly or recklessly "conceal[ ], harbor[ ], or shield[ ] from detection, or attempt[ ] to conceal, harbor or shield from detection" an alien who "has come to, entered, or remains in the United States" illegally; and (4) 8 U.S.C. §

23

1324(a)(1)(A)(v), which makes it a federal crime for any person to conspire to commit, or to aid and abet, any violation of § 1324(a)(1)(A)(i)–(iv).  According to the amended complaint, the defendants have committed "tens and scores if not hundreds," of these predicate acts.  We will address in turn each of those four statutory theories of predicate acts.

**A.**

Section 1324(a)(3)(A) provides:  "Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in [§ 1324(a)(3)(B)] shall be fined under Title 18 or imprisoned for not more than 5 years, or both."  8 U.S.C. § 1324(a)(3)(A).  The term "alien" refers to (1) "an unauthorized alien," as defined in § 1324a(h)(3), who (2) "has been brought into the United States in violation of [§ 1324(a)]."  See 8 U.S.C. § 1324(a)(3)(B).[13]

Thus, an element of § 1324(a)(3)(A) is that the defendant had actual knowledge that the illegal aliens who were hired had been brought into the country in violation of § 1324(a).  See Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 387 (2d Cir. 2001); Nichols v. Mahoney, 608 F. Supp. 2d

---

[13] Section 1324a(h)(3) defines an unauthorized alien, "with respect to the employment of an alien at a particular time," as an "alien [who] is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."  8 U.S.C. § 1324a(h)(3).

526, 534 (S.D.N.Y. 2009) ("If the employer does not know that at least 10 of its illegal hires were 'brought into' the country by some third party (as opposed to walking across the border themselves, or arriving on a visitor's or student visa and overstaying their welcome), then it has not committed a RICO predicate act by hiring them . . . .").

That "brought into" element makes § 1324(a)(3)(A) different from § 1324a(a)(1)(A), which also addresses the hiring of illegal aliens. See Nichols, 608 F. Supp. 2d at 534 (comparing the two provisions).[14] While both provisions make it illegal for a person or other entity to hire an alien knowing that he is not authorized to work in this country, § 1324(a)(3)(A) has the added element of knowledge that the alien was brought into the country illegally. That added element makes a difference when it comes to the penalty. See id. If an employer hires 10 or more illegal aliens with knowledge that they are unauthorized aliens who have been illegally brought into this country, § 1324(a)(3)(A) applies and the employer may be fined, sentenced to as much as 5 years in prison, or both. And that crime would be a RICO predicate act. See 18 U.S.C. § 1961(1)(F). By contrast, if an employer knowingly hires aliens not authorized to work in this

_____

[14] Section 1324a(a)(1)(A), among other things, makes it illegal for a person or other entity "to hire . . . for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in [§ 1324a(h)(3)]) with respect to such employment." See § 1324a(a)(1)(A).

country, without knowledge that they were brought into this country illegally, only § 1324a would be violated. For a violation of § 1324a only civil penalties are available, unless there is a "pattern or practice" in which case a conviction may result in a fine and a sentence of up to six months. See 8 U.S.C. § 1324a(f)(1). And that crime would not be a RICO predicate act. See 18 U.S.C. § 1961(1)(F); see also United States v. Zheng, 306 F.3d 1080, 1085 (11th Cir. 2002) ("The criminal sanctions prescribed for a violation of § 1324a are much less stringent than those prescribed for a violation of § 1324.").

The differences between §§ 1324(a)(3)(A) and 1324a(a)(1)(A) suggest that Congress found the combination of bringing illegal aliens into this country and hiring them to be a far more serious problem than hiring aliens who were here illegally but had not been brought here. Congress obviously sought not only to deter employers from directly joining forces with those who bring in illegal aliens but also to prevent them from encouraging the practice by hiring aliens knowing that they had been brought in illegally.

The district court concluded that the plaintiffs had failed to plead that Prime or any of its employees had actual knowledge that the unauthorized aliens who they hired had been "brought into the United States" in violation of § 1324. The plaintiffs contend that they have pleaded enough because they allege that Prime

26

"repeatedly violated and continues to violate 8 U.S.C. § 1324(a)(3)(A), which makes it a federal crime to knowingly hire for employment at least 10 individuals with actual knowledge that the individuals are aliens during a twelve month period." Am. Complaint ¶ 36 (quotation marks omitted). They argue that a similar allegation was held to be sufficient in Williams v. Mohawk Indus. Inc., 465 F.3d 1277, 1281–82 (11th Cir. 2006), and should be sufficient here. We are unpersuaded.

The complaint in Mohawk, unlike the one in this case, specifically alleged that the defendant had hired illegal aliens knowing that those workers were "smuggled or otherwise brought" into the United States illegally. Williams v. Mohawk Indus., Inc., 314 F. Supp. 2d 1333, 1346 (N.D. Ga. 2004), aff'd in part, rev'd in part on other grounds by 465 F.3d 1277 (11th Cir. 2006). Here, by contrast, the plaintiffs have never alleged that any of the defendants knew the aliens who were hired had been illegally brought into the United States. The closest the plaintiffs come is their allegation that "Prime hired and allowed employees to remain employees despite the fact that . . . they were known by Prime's management as unauthorized or ineligible to work or even be in this Country." Am. Complaint ¶ 26 (emphasis added). Perhaps that allegation "gets the [§ 1324(a)(3)(A)] complaint close to stating a claim, but without some further

factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." Twombly, 550 U.S. at 557, 127 S.Ct. at 1966 (internal quotation marks omitted). An employer may know that it hired illegal aliens without knowing how they made their way into the United States. As the district court recognized in this case, "Individuals who enter this country legally may overstay their welcome and become unauthorized to work without ever having been brought in illegally, whether by others or by themselves." Edwards v. Prime, Inc., No. 08-1016, at 12 (N.D. Ala. Mar. 4, 2009); see also Nichols, 608 F. Supp. 2d at 534. Likewise, they may have entered this country illegally on their own instead of having been "brought into" it. See id. (noting that some illegal hires "walk[ ] across the border themselves, or arriv[e] on a visitor's or student visa and overstay[ ] their welcome"). Because the "brought into" element is essential to § 1324(a)(3)(A), plaintiffs who do not allege it have not alleged a predicate act under that provision. They may have alleged a violation of § 1324a(a)(1)(A), but that is not a predicate act for RICO purposes.

Although in some cases a plaintiff who fails to allege the "brought into" element necessary for a § 1324(a)(3)(A) violation might be entitled to a second chance to plead it, see Commercial Cleaning Servs., 271 F.3d at 387 & n.5, these plaintiffs have already had their second chance. In dismissing without prejudice

28

the RICO claim made by the plaintiffs in their original complaint, the district court stressed the plaintiffs' failure to allege the "brought into" element of § 1324(a)(3)(A). In drafting their amended complaint, the plaintiffs had an opportunity to fix the problem, assuming they were able to do so without violating Rule 11. Because they did not fix it, they have failed to plead a violation of § 1324(a)(3)(A) and so cannot establish a predicate act that way.

**B.**

The plaintiffs have more predicate act success with their allegations that the defendants violated § 1324(a)(1)(A)(iv), the elements of which are: "(1) encouraging or inducing; (2) an alien; (3) to come to, enter, or reside in the United States; and (4) knowing or in reckless disregard that the alien's coming to, entering, or residing in the United States is illegal." United States v. Lopez, 590 F.3d 1238, 1250 (11th Cir. 2009).[15]

---

[15] Section 1324(a)(1)(A)(iv) provides that any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" shall be punished as provided in § 1324(a)(1)(B). 8 U.S.C. § 1324(a)(1)(A)(iv).

Where the violation of § 1324(a)(1)(A)(iv) "was done for the purpose of commercial advantage or private financial gain," the defendant may "be fined under Title 18, imprisoned not more than 10 years, or both." § 1324(a)(1)(B)(i). Where the violation was not for pecuniary gain, a fine under Title 18 is still possible, but the maximum term of imprisonment is 5 years. § 1324(a)(1)(B)(ii). Subsection (B) also contains enhanced penalties where the violation causes serious bodily injury or places any person's life in jeopardy, see § 1324(a)(1)(B)(iii), or causes death, see § 1324(a)(1)(B)(iv).

The only element the defendants contend has not been sufficiently pleaded is the first one, which is that the plaintiffs "encouraged or induced" illegal aliens to reside in this country. The district court concluded the plaintiffs had not pleaded that element even though they had alleged that the defendants had knowingly supplied the aliens with jobs and with social security numbers to facilitate their employment. The court believed those alleged actions do not amount to encouragement or inducement for purposes of § 1334(a)(1)(A)(iv). See Edwards v. Prime, Inc., No. 08-1016, at 12–13 (N.D. Ala. Dec. 11, 2008). We believe the district court was mistaken.

This Court has given a broad interpretation to the phrase "encouraging or inducing" in this context, construing it to include the act of "helping" aliens come to, enter, or remain in the United States. See Lopez, 590 F.3d at 1249–51; United States v. Ndiaye, 434 F.3d 1270, 1278 (11th Cir. 2006); United States v. Kuku, 129 F.3d 1435, 1437 (11th Cir. 1997). In Lopez we held that the district court had accurately presented the substantive law of § 1324(a)(1)(A)(iv) to the jury by informing it that the term "encourage" was defined as "to knowingly instigate, to incite to action, to give courage to, to inspirit, to embolden, to raise confidence, to help, to forward, and/or to advise." Lopez, 590 F.3d at 1247; see also id. at 1249 (citing similar dictionary definitions of "encourage" with approval). The defendant

30

in that case had captained a boat to the Bahamas, refueled it, spent the night, picked up aliens from a hotel, and then driven the boat as it returned with the aliens towards the United States.  Id. at 1252.  This Court held that conduct was "more than adequate" to support a conviction under § 1324(a)(1)(A)(iv).  Id.

Similarly, in Ndiaye this Court affirmed a defendant's conviction under § 1324(a)(1)(A)(iv) for helping one illegal alien fraudulently obtain a social security number.  434 F.3d at 1296.  The defendant contended that the Government "failed to show any actual, potential or perceived relationship between immigration status and receipt of a Social Security number."  Id.  He argued "that while there may be some correlation between the issuance of Social Security numbers and aliens employed in the United States, the act of merely helping someone obtain a Social Security number cannot be construed as 'encouraging or inducing' them to reside in this country in violation of the criminal statute."  Id. at 1297–98 (emphasis added).  We rejected that argument.  Since the alien "was able to work in the United States because of the Social Security number he was issued," we held that a reasonable "jury could have found that [the defendant] encouraged or induced an alien . . . to reside in the United States, knowing it was in violation of the law."  Id. at 1298; see also id. ("A jury could find that [the defendant's] assistance in helping [an alien] obtain a Social Security card, which the evidence established he is not

31

entitled to have, encouraged or induced him to reside in this country in violation of the statute."). Consistent with that decision is <u>Kuku</u> in which we affirmed a conviction under § 1324(a)(1)(A)(iv) for fraudulently approving social security card applications that were filed on behalf of illegal aliens. 129 F.3d at 1437. Although the scope of § 1324(a)(1)(A)(iv) was not at issue in that case, we did recognize that social security numbers can be used "to apply for federal benefits, to attend school, and to obtain employment." <u>Id.</u>; <u>see also</u> <u>Ndiaye</u>, 434 F.3d at 1298 (discussing <u>Kuku</u>).

The district court in this case, without the benefit of either <u>Lopez</u> or <u>Ndiaye</u>,[16] held that the amended complaint failed to allege a predicate act under § 1334(a)(1)(A)(iv) because "mere employment" of illegal aliens is not enough to encourage or induce aliens to reside in the United States. The district court cited, and the defendants press, <u>United States v. Khanani</u>, 502 F.3d 1281, 1289 (11th Cir. 2007), as support for that conclusion. The <u>Khanani</u> decision is fine as far as it goes, but it did not involve the additional, and under <u>Ndiaye</u> critical, fact of employer-supplied social security numbers.

The amended complaint alleges not only that the defendants hired and

---

[16] The <u>Lopez</u> decision was published nine months after the district court issued its second memorandum opinion in this case. The <u>Ndiaye</u> decision is from 2006, but neither party cited it to the district court or in their initial briefs to this Court. After finding the decision, we gave the parties an opportunity to supplementally brief its application to this case.

actively sought out individuals known to be illegal aliens but also that the defendants provided them with names and social security numbers to facilitate their illegal employment.  See Am. Complaint ¶ 34 (the defendants "provid[ed] known illegal aliens with names and Social Security numbers of American citizens to use in their illegal employment"); see also id. ¶ 26.

Recognizing the striking similarity between Ndiaye and this case, the defendants have managed to come up with a number of proposed distinctions, but resourcefulness is one thing and persuasiveness is another.  They contend that the amended complaint alleges only that the defendants knowingly encouraged or induced illegal aliens to work in the United States instead of encouraging or inducing them to "reside" here.  According to them, the prospect of working at a particular restaurant (even a Ruth's Chris Steak House!) does not provide any realistic incentive for staying in this country.  They insist that aliens could reside outside the United States and simply enter periodically as work is needed.  That argument borders on the frivolous.  As we held in Ndiaye, the act of knowingly providing illegal aliens with social security numbers can "encourage or induce" them to reside in this country.  See Ndiaye, 434 F.3d at 1296–98 (noting, and later rejecting, the defendant's argument that:  "[w]hile many aliens used Social Security numbers to secure employment while residing in the United States, those

aliens had already entered the country . . . and there was no evidence that anyone was 'induced' to live here by obtaining such a card").  The defendants' argument runs against the common sense knowledge that most illegal aliens, especially the ones who end up working here, come to this country for work.  See Zheng, 306 F.3d at 1087 (noting that one "primary reason" for illegal immigration is "the chance of employment in the United States" (citation omitted)).  Their ability to find and keep jobs depends to a considerable extent on improperly obtaining the necessary documentation.[17]

Continuing to gnaw at the issue, the defendants also argue that Ndiaye can be distinguished because it was a multi-defendant case involving a massive conspiracy to file false immigration documents with the Social Security Administration.  See Ndiaye, 434 F.3d at 1277–78.  They point out that the defendant in that case who was convicted under § 1324(a)(1)(A)(iv) had helped more than 70 illegal aliens obtain social security numbers and cards.  Id. at 1278.  But the number of aliens he helped was not material to our holding.  The actual

---

[17] At oral argument, defense counsel suggested that fraudulent social security numbers are unrelated to residency because some people, such as those with a student visa, are allowed to live in the United States even though they may not work here.  When we suggested to counsel that at least some aliens would be encouraged to reside here if they had a social security number, she replied:  "That point I concede."  That concession, which she could hardly have avoided, is important because the amended complaint was dismissed on a Rule 12(b)(6) motion, and a RICO predicate act under § 1324(a)(1)(A)(iv) can be stated if the defendants knowingly encouraged or induced "an alien" to reside in the United States.

charge in that case was that the defendant encouraged or induced "one specific alien" to reside in the United States by helping him fraudulently obtain a social security number. Id. at 1296. One or one hundred, it is all the same for purposes of this § 1324(a)(1)(A)(iv) "encouraging or inducing" issue.

Scraping the bone, the defendants argue that the amended complaint does not allege that the aliens were in possession or even had knowledge of the social security numbers under which they were allowed to work. At most, they suggest, the numbers were used for employment at Prime. They are wrong. The amended complaint alleges that Prime "even provided" the illegal alien employees with the names and social security numbers of former Ruth's Chris employees. Am. Complaint ¶ 26. Construing that allegation in the light most favorable to the plaintiffs, Prime gave the social security numbers to the illegal aliens, allowing them to use the numbers for the purpose of getting and holding jobs.

The meat of the matter is that the amended complaint adequately pleads that the defendants encouraged or induced an alien to reside in the United States, and either knew or recklessly disregarded the fact that the alien's residence here was illegal, in violation of § 1324(a)(1)(A)(iv). It thereby states a predicate act of racketeering. And because the amended complaint also alleges that the defendants did that "far more times than two," it adequately pleads the pattern of racketeering

35

activity necessary to state a RICO claim.  See Mohawk, 465 F.3d at 1283; Cox, 17 F.3d at 1397.

## C.

For the reasons we have just discussed, the plaintiffs are entitled to get past the Rule 12(b)(6) stage on their allegation of a § 1324(a)(1)(A)(iv) predicate act. That one theory may also be enough to get them past summary judgment and to a verdict, or it may not.  Because we have no way of knowing what the evidence will show about that theory of the case, and in the interests of completeness, we need to address the plaintiffs' other theories of racketeering.

The first additional theory involves § 1324(a)(1)(A)(iii), which makes it a crime for any person who:  "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien . . . ."  8 U.S.C. § 1324(a)(1)(A)(iii).  When viewed against the allegations of the amended complaint, the question presented by this theory of racketeering is whether knowingly providing an illegal alien with employment and a social security number is enough to constitute concealing, harboring, or shielding the alien from detection for § 1324(a)(1)(A)(iii) purposes.

The defendants argue that in Khanani we held that the knowing employment

36

of an illegal alien is not enough by itself to violate § 1324(a)(1)(A)(iii). They point

to this sentence in that opinion: "If Khanani merely had employed illegal aliens

without 'knowingly' encouraging or inducing them to reside in the United States,

he would not have committed the elements of the offenses . . . ." Khanani, 502

F.3d at 1289 (emphasis added). That sentence is subject to interpretation, but a

more important point about it for present purposes is signaled by the first word:

"If." The Khanani decision could not have established anything about what falls

short of violating § 1324(a)(1)(A)(iii). It could not have because in that case we

actually held that there was a violation of the provision. A holding that $X + Y$ is

enough to violate a provision does not mean that $X$ alone is not enough. And that

is true even if we say in our opinion in a case involving both $X$ and $Y$ that $X$ alone

would not be enough. We have pointed out many times that regardless of what a

court says in its opinion, the decision can hold nothing beyond the facts of that

case. E.g., Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir.

2003) ("Whatever their opinions say, judicial decisions cannot make law beyond

the facts of the cases in which those decisions are announced."); United States v.

Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision

can reach only as far as the facts and circumstances presented to the Court in the

case which produced that decision." (quotation marks omitted)). All statements

that go beyond the facts of the case—and sometimes, but not always, they begin with the word "if"—are dicta.  See, e.g., United States v. Eggersdorf, 126 F.3d 1318, 1322 n.4 (11th Cir. 1997) ("[L]anguage in . . . [an opinion] not necessary to deciding the case then before us" is dicta); Moon v. Head, 285 F.3d 1301, 1318 (11th Cir. 2002) (Carnes, J., concurring) ("Those statements are dicta.  They are dicta because they go beyond the facts of the [prior] case itself . . . .").  And dicta is not binding on anyone for any purpose.  See, e.g., McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996) ("[W]e are not required to follow dicta contained in our own precedents . . . ."); Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller, 957 F.2d 1575, 1578 (11th Cir. 1992) (because what is said in a prior opinion about a question not presented there is dicta, and dicta is not binding precedent, a later panel is "free to give that question fresh consideration").  In any event, in Khanani the employer did not provide the illegal aliens with social security numbers and names; this employer allegedly did.  Moreover, the Khanani opinion did not consider the way that § 1324(a)(i)(A)(iii) had been revised over the years.

The statutory evolution of § 1324(a)(i)(A)(iii) indicates that knowingly or recklessly hiring illegal aliens probably is enough by itself to constitute concealing, harboring, or shielding from detection for purposes of the statute.  See United

States v. Kim, 193 F.3d 567, 573–74 (2d Cir. 1999) (explaining the evolution of this provision); see also Zheng, 306 F.3d at 1085 (citing Kim with approval). Section 1324(a) was enacted in 1952 and remained unchanged until 1986. The current version of § 1324(a)(1)(A)(iii) is nearly identical to the pre-1986 version, which provided that a person who "willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection [an illegal alien], in any place, including any building or any means of transportation," is guilty of a felony. 8 U.S.C. § 1324(a)(3) (1982); see also 8 U.S.C.A. § 1324 note (West 2006). However, there is one important difference for our purposes. The pre-1986 version of § 1324(a) had also stated: "Provided, however, [t]hat for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." 8 U.S.C. § 1324(a) (1982) (emphasis added). Significantly, Congress removed that exception when it revised the statute in 1986. See The Immigration Reform and Control Act of 1986, Pub.L. No. 99-603, § 112(a), 100 Stat. 3359, 3381–82 (1986). The Second Circuit pointed out that "after the 1986 amendment, § 1324 no longer excluded employment from the prohibition against harboring." Kim, 193 F.3d at 574. That observation led that court to conclude that "[t]he present version of § 1324, which is sufficiently broad on its face to encompass the knowing or reckless

39

harboring of illegal aliens by employers, was plainly intended to have that breadth."  Id.

We tend to agree with the Second Circuit that the revision history of § 1324(a)(1)(A)(iii) strongly indicates that one who hires an alien knowing or recklessly disregarding his illegal status is guilty of concealing, harboring, or shielding from detection.  See Zheng, 306 F.3d at 1086–87 (taking the revision history of § 1324 into account when deciding a related issue).  As we have explained, "changes in statutory language generally indicate an intent to change the meaning of the statute."  DIRECTV, Inc. v. Brown, 371 F.3d 814, 817 (11th Cir. 2004) (quotation marks and alterations omitted); see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 57–58, 126 S.Ct. 1297, 1306 (2006) ("We refuse to interpret the [statute] in a way that negates its recent revision, and indeed would render it a largely meaningless exercise."); Heintz v. Jenkins, 514 U.S. 291, 294, 115 S.Ct. 1489, 1490–91 (1995) (stating that a "rather strong reason[ ] for believing that the Act applies" to a particular group is the fact that an express exemption for the group had existed in the prior enacted version of the statute, but "Congress repealed [that] exemption in its entirety"); Snapper, Inc. v. Redan, 171 F.3d 1249, 1257–58 (11th Cir. 1999) (examining the previous enacted versions of a statute as an aid to interpreting the current version).

As strongly as the revision history indicates it, however, we need not decide whether knowingly employing illegal aliens alone is enough. Here the allegations are that the defendants not only knowingly employed illegal aliens, but also that they provided them with social security numbers and names, and paid them in cash in order to conceal, harbor, and shield the aliens from detection. See United States v. Shum, 496 F.3d 390, 392 (5th Cir. 2007) (characterizing proof that the defendant had provided false identification to illegal alien employees and failed to file their social security paperwork as "ample evidence" that he had taken "steps that would shield their identities from detection by the government"); Kim, 193 F.3d at 574–75 (finding sufficient evidence to support conviction for harboring where the defendant took steps designed to help the illegal alien employee remain undetected); see also United States v. Ye, 588 F.3d 411, 417 (7th Cir. 2009) (recognizing that government detection of illegal aliens becomes more difficult when an employer intentionally fails to keep accurate employment records for its illegal workers and pays them in cash). That is enough to state a violation of § 1324(a)(1)(A)(iii). And, as we mentioned earlier, a violation of that provision is a predicate act for civil RICO purposes.

**D.**

The next predicate act alleged in the amended complaint is a violation of §

41

1324(a)(1)(A)(v), which makes it a federal crime to "engage[ ] in any conspiracy to commit any of the preceding acts [those in § 1324(a)(1)(A)(i)–(iv)], or aid[ ] or abet[ ] the commission of any of the preceding acts."  8 U.S.C. § 1324(a)(1)(A)(v).  The amended complaint says the defendants violated that provision "by engaging in conspiracies to commit, and aiding and abetting others to commit, the preceding violations [of §§ 1324(a)(1)(A)(iii) and (iv)]."  Am. Complaint ¶ 34c.  The district court concluded that the amended complaint did not plead a predicate act under § 1324(a)(1)(A)(v) because it failed to describe any substantive violations of §§ 1324(a)(1)(A)(iii) and (iv).  The district court also found the allegation was conclusory and therefore insufficient under Twombly.

We have already concluded that the amended complaint does adequately plead a pattern of racketeering activity.  We do agree, however, with the district court that the conspiracy and aiding and abetting allegations do not pass muster under Twombly.  The mere use of the words "conspiracy" and "aiding and abetting" without any more explanation of the grounds of the plaintiffs' entitlement to relief is insufficient.  See Twombly, 550 U.S. at 555, 127 S.Ct. at 1964–65; Sinaltrainal, 578 F.3d at 1261.  For that reason, we leave intact the district court's ruling that the allegations in the amended complaint involving 1324(a)(1)(A)(v) do not state a predicate act.  That's the end of our RICO discussion.

42

**VI.**

We turn now to a claim arising under another statute. The district court dismissed Count 12 of the amended complaint in which plaintiff Edwards attempted to plead a hostile work environment claim under 42 U.S.C. § 1981. To plead that claim Edwards was required to allege that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability. See Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (requiring the same elements for a Title VII hostile work environment claim); see also Shields v. Fort James Corp., 305 F.3d 1280, 1282 & n.2 (11th Cir. 2002) (noting that Title VII and § 1981 hostile work environment claims have the same elements and are subject to the same analytical framework).

Edwards contends the district court erred in dismissing Count 12 of the amended complaint for failure to state a claim under § 1981. The district court decided that the "conclusory allegations only describe, albeit ambiguously,

43

discrimination based on employment status, not race, and certainly do not meet the pleading standards for a racially hostile [work] environment." Edwards v. Prime, Inc., No. 08-1016, at 14 (N.D. Ala. Mar. 4, 2009). Edwards argues that the court should have given more weight to the opening sentence of Count 12, which asserts that "[i]n his work for Prime, Plaintiff Edwards was subjected to a hostile discriminatory environment on the basis of his race, in violation of 42 U.S.C. § 1981." That broad statement, however, is merely a "formulaic recitation of the elements" of a § 1981 claim and, standing alone, does not satisfy the pleading standard of Federal Rule of Civil Procedure Rule 8. Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; see Iqbal, 129 S.Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Instead, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. at 1974); see Sinaltrainal, 578 F.3d at 1261; Rivell, 520 F.3d at 1309; Fin. Sec. Assurance, 500 F.3d at 1282. An introductory conclusion cannot take the place of factual allegations in stating a plausible claim for relief.

Although the amended complaint does allege that Edwards was threatened,

assaulted, and shunned by his Hispanic and Latino co-workers, which created a hostile work environment, it does not plausibly allege that he was harassed because he is Caucasian. To the contrary, the allegations are that he was threatened by a Hispanic co-worker because he complained about Prime's employment of illegal aliens. See Am. Complaint ¶ 124 ("Plaintiff Edwards was threatened on the job again by [a] Hispanic Latino of Defendant Prime, who told Edwards it was 'going to be bad' for the person who was complaining about Prime's employment of illegal aliens."). The amended complaint also alleges that Prime failed to intervene because it did not want to upset the Hispanic and Latino employees and compromise its ability to hire cheap illegal labor. That allegation, like the other one, suggests that Prime discriminated against Edwards because he had complained, or because his co-workers believed he had complained, about Prime's employment of illegal aliens—not because of his race. The facts that Edwards is Caucasian and that the co-workers who were threatening and shunning him were Hispanic or Latino, by themselves, do not state a plausible claim of race discrimination. Those factual allegations are not "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. at 1965.[18]

---

[18] Edwards argues that an employer's failure to remedy a hostile work environment is not excused by the employer's belief that it needs to appease a group of employees. Cf. Diaz v. Pan Am. World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971) (preferences of customers or co-workers do not defeat a claim of sex discrimination). That may be true, but as we have

For these reasons we agree with the district court that Count 12 of the amended complaint does not state a claim for relief under § 1981.

## VII.

Turning to the state law claims, the district court dismissed Count 7, which attempted to assert against Prime and Oswald a claim for wrongful interference with a business relationship. It also dismissed Count 8, which attempted to state a claim for conversion against the same two defendants. The court dismissed both claims on the ground that they were preempted by the Fair Labor Standards Act. Although the parties have primarily focused on the preemption issue in their arguments to us, Prime and Oswald also contend that neither count states a claim under Alabama law. If they are right about that, there is no need for us to address the preemption issues.

## A.

The state law problem with Count 7, according to Prime and Oswald, is that it does not allege that either one of them was a third party, or stranger, to the business relationships described in the amended complaint. Under Alabama law,

explained, the amended complaint does not adequately allege that the hostility of Edwards' co-workers was based on his membership in a protected group.

46

the tort of wrongful interference with a business relationship has five elements: (1) the existence of a protected business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage. White Sands Group, LLC v. PRS II, LLC, __ So. 3d __, 2009 WL 2841114, *7 (Ala. 2009). The third element in that framework, and the only one at issue in this appeal, places the burden on the plaintiff to establish (or at this stage to plead) that the defendant was a stranger to the protected business relationship with which the defendant interfered. Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143, 1154 (Ala. 2003). A plaintiff fails to meet that burden when the defendant is a party in interest to the allegedly injured business relationship. Id. (citing Colonial Bank v. Patterson, 788 So. 2d 134, 137 (Ala. 2000), overruled on other grounds by White Sands, 2009 WL 2841114, at *7; Ex parte Blue Cross & Blue Shield, Inc., 773 So. 2d 475, 480 (Ala. 2000)).

The Alabama Supreme Court has stated that "a defendant is a party in interest to a business or contractual relationship if the defendant has any beneficial or economic interest in, or control over, that relationship." Tom's Food, Inc. v. Carn, 896 So. 2d 443, 454 (Ala. 2004) (quotation marks and citation omitted); see also Waddell & Reed, 875 So. 2d at 1157 ("A person with a direct economic

47

interest in the contract is not a stranger to the contract. Parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." (quoting LaSonde v. Chase Mortgage Co., 577 S.E.2d 822, 824 (Ga. Ct. App. 2003); Waddell's emphasis omitted). When the defendant is an essential party to the allegedly injured business relationship, the defendant is a participant in that relationship instead of a stranger to it. See Tom's Food, 896 So. 2d at 455 (holding that the defendant was not a stranger to the business relationship between the other two parties because the defendant "was involved in creating that relationship"); see also Waddell & Reed, 875 So. 2d at 1157; BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So. 2d 203, 214 (Ala. 2001) (holding that where a contract would not have been consummated without the participation of a certain party, that party is "anything but a stranger to the relationship"); Cobb v. Union Camp Corp., 786 So. 2d 501, 506 (Ala. Civ. App. 2000) (holding that defendant landowner was "an essential party," instead of a stranger, to the business relationship between its timber harvester and a logger who entered a contract with the harvester), rev'd on other grounds by Ex parte Union Camp Corp., 816 So. 2d 1039 (Ala. 2001).

Count 7 of the amended complaint fails to allege any facts indicating that Prime and Oswald were strangers to the business relationships with which they

48

allegedly interfered. Because a restaurant's proceeds depend on its patrons and its costs depend heavily on its payroll, the defendants had an obvious economic interest in both the employee-patron relationship and the employees' relationships with each other. See Tom's Food, 896 So. 2d at 454; Waddell & Reed, 875 So. 2d at 1157. Even though Prime and Oswald should not interfere with tips that patrons give to employees of the restaurant, see 29 C.F.R. § 531.52 (2009) (requiring a customer's tipping of a server to be "free of any control by the employer"), they still exercise control over the employee-patron relationship through their management of the premises, the menu, and their employees' service to patrons. Like the defendants in Tom's Food, Prime and Oswald were essential parties to the business relationships alleged in Count 7. They were involved in creating those relationships; without them the plaintiffs would have had no relationship with the patrons of the restaurant or with their co-workers. See Tom's Food, 896 So. 2d at 455; see also BellSouth Mobility, 814 So. 2d at 214; Cobb, 786 So. 2d at 506.

The plaintiffs argue that a restaurant does not always create the business relationship between a customer and a server, because in some instances customers choose to dine at a restaurant not because of the food but because of the servers. (The epitome of that, we suppose, might be one of those establishments in which not all of the employees are fully clothed.) The plaintiffs compare a restaurant and

49

its servers to the proverbial chicken and egg, and they ask us not to hazard a guess as to which came first. This is one instance, however, in which the chicken must come before the egg. A customer cannot be impressed with the service at a restaurant before there is one. Without a restaurant there are no servers and no patrons to strike up a relationship. See Tom's Food, 896 So. 2d at 455. The connections among the defendants, the employees, and the restaurant's patrons are "interwoven" enough that Prime and Oswald are not strangers to the relationship between their employees and their patrons. See id.; Waddell & Reed, 875 So. 2d at 1157. Because the defendants were not strangers to the business relationships with which they allegedly interfered, Count 7 of the amended complaint fails to state a claim under Alabama law.[19]

**B.**

The state law claim attempted in Count 8 is conversion. Prime and Oswald contend the attempt fails because there is no allegation the defendants took specific money that could be identified. They are right. To establish a claim for conversion under Alabama law, there must be "a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse of

---

[19] The most helpful case to the defendants' side of this issue is Tom's Food, which their counsel apparently overlooked. To his credit, counsel for the plaintiffs cited it as a "But see" authority in his reply brief. We appreciate his professionalism.

another's property."  Convington v. Exxon Co., 551 So. 2d 935, 938 (Ala. 1989) (citations omitted); see also Ex parte Anderson, 867 So. 2d 1125, 1129 (Ala. 2003).  The Alabama Supreme Court has repeatedly held that an action for the conversion of money is improper unless there is earmarked money or specific money capable of identification.  E.g., Hensley v. Poole, 910 So. 2d 96, 101 (Ala. 2005); Campbell v. Naman's Catering, Inc., 842 So. 2d 654, 659 (Ala. 2002); Gray v. Liberty Nat'l Life Ins. Co., 623 So. 2d 1156, 1160 (Ala. 1993); Convington, 551 So. 2d at 938; see also Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 732 F.2d 859, 862 (11th Cir. 1984).

Money is specific and capable of identification where, for example, it is "money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum."  Gray, 623 So. 2d at 1160 (emphasis added); see also Hensley, 910 So. 2d at 101.  That rule was applied in Lewis v. Fowler, 479 So. 2d 725, 727 (Ala. 1985), where the Alabama Supreme Court declined to extend the definition of "specific money capable of identification" to money that an employer withheld from an employee's wages in response to a garnishment action.  Although the employer may have owed the employee a certain sum of money, there was "no obligation to

51

return <u>the identical money</u>, but only a relationship of debtor or creditor." <u>Id.</u>

(emphasis added). Employees care about the amount of their wages, not whether

they receive particular coins or bills, or money in a bag or chest, or payment into a

special account. <u>Id.</u>; <u>see also</u> <u>SouthTrust Bank v. Donely</u>, 925 So. 2d 934, 938

(Ala. 2005) (citing <u>Knox v. Moskins Stores, Inc.</u>, 2 So. 2d 449, 450 (1941), for the

proposition that "there is no conversion when an employer allegedly erroneously

assigns an employee's wages"); <u>Campbell</u>, 842 So. 2d at 660 (affirming summary

judgment against plaintiff on a conversion claim where the employer had

continued to deduct premiums from his paycheck even though it had stopped

paying those premiums to the employee's insurance company).

The plaintiffs argue that it is enough that the amended complaint alleges the

defendants "converted specific and identifiable amounts of money" and that "the

amounts taken [were] and [are] identified by, calculated and based on tips and

gratuities paid to servers."[20] They insist that we must accept those allegations as

---

[20]With respect to the conversion claim, the amended complaint states:

Defendants Prime, as part of its regular business practices implemented and approved by Defendant Oswald, converted specific and identifiable amounts of money from Plaintiffs (but not Plaintiff George) and other employees; the amounts taken [were] and [are] identified by, calculated and based on tips and gratuities paid to servers. These takings of money were and are wrongful retentions of or interference with Plaintiffs' money and constituted conversion of money that belonged to Plaintiffs <u>regardless</u> of whether Defendants otherwise complied with the FLSA in compensating Plaintiffs.

52

true given the procedural posture of this case.

The plaintiffs' argument misunderstands Alabama law. The amended complaint alleges that the defendants converted identifiable <u>amounts</u> of money. Identifiable amounts of money are one thing, specific money capable of identification is another. Cases such as <u>Gray</u> and <u>Lewis</u> held that an action for the conversion of money requires the money itself, not just the amount of it, to be specific and capable of identification. See <u>Gray</u>, 623 So. 2d at 1160 (conversion claim requires "specific money," such as money in a bag, rather than a "certain sum" of money, where only the quantity is known); <u>Lewis</u>, 479 So. 2d at 727 (conversion claim requires an obligation to return "identical money," not merely an obligation to pay a debt). In cases where employees brought conversion claims to recover improperly withheld wages, a particular amount of money was at stake but the plaintiffs lost because "specific money" was not. See <u>Campbell</u>, 842 So. 2d at 660; <u>Lewis</u>, 479 So. 2d at 727; <u>Knox</u>, 2 So. 2d at 450. This case is no different. The plaintiffs want their tips returned but it would be implausible to suggest, and they have not alleged, that Prime and Oswald have those particular tips stored in a bag somewhere, much less segregated in a fashion that would permit matching them up to each individual plaintiff.

The plaintiffs point to the allegation in the amended complaint that servers

53

had to fill out tip reports accounting for the percentage of tips that would be "taken by the house."[21]  They argue that was an "earmarking" process and that by alleging it the amended complaint states a claim under Alabama's law of conversion.  Their argument confuses the method by which the amount was calculated with the requirement that the money itself be specific and identifiable.  See Hensley, 910 So. 2d at 101 (holding that there was no cause of action for conversion where the plaintiff claimed he was due a 30% share of business profits but did not prove "that the money at issue was in any way segregated or identifiable"); Gray, 623 So. 2d at 1160; Lewis, 479 So. 2d at 727.  The amended complaint does not allege that the withheld tips were ever "sequestered" from other monies collected by the defendants.  See Covington, 551 So. 2d at 939 (holding that funds "never segregated into a separate account" were commingled money and therefore not "specific and identifiable"); cf. Greene County Bd. of Educ. v. Bailey, 586 So. 2d 893, 899–900 (Ala. 1991) (holding that plaintiff had stated a claim for conversion where the complaint alleged that the defendant wrongfully took funds that had been "specifically deposited" in a school's "lunchroom account").

As the Alabama Supreme Court stated in Lewis:

---

[21]The amended complaint alleges that Ruth's Chris took 25% of its servers' tips.  Servers had to complete "tip reports" that included this calculation:  (Gross Tips + Bartender, Carver Fees – House 5% [20% Gratuity x .25] = Net Total).

> Clearly, there is no identifiable coin or bill, and nothing that has been sealed up in a particular letter, "wrapped up to itself," or placed in a bag or chest. There is no evidence that this money was placed in a special account. It is merely money which was not paid to an employee . . . .

479 So. 2d at 727. Count 8 of the amended complaint fails to state a claim for conversion under Alabama law.

## VIII.

We REVERSE the district court's dismissal of Count 1 of the amended complaint and AFFIRM its dismissal of Counts 7, 8, and 12. We DISMISS the appeal for lack of appellate jurisdiction insofar as it concerns any other claims or rulings.